579 So.2d 981 (1991)
CENTRAL LOUISIANA ELECTRIC CO., INC.
v.
WESTINGHOUSE ELECTRIC CORPORATION, et al.
No. 90-C-2485.
Supreme Court of Louisiana.
May 6, 1991.
Rehearing Denied June 13, 1991.
*982 William O. Bonin, Landry, Watkins & Bonin, New Iberia, for Cent. LA Elec. Co. plaintiff-applicant.
Robert E. Couhig, Jr., Leslie A. Lanusse, and John W. Lindner, II, New Orleans, for Westinghouse Elec. Corp., et al. defendants-respondents.
COLE, Justice.
The issue presented in this case is whether an insurance policy which provides coverage for loss or damage to property directly caused by an accident, but which specifically excludes corrosion from the definition of accident, covers the cost of replacing an entire blade unit due to the presence of corrosive pitting and resultant cracks.

*983 I. Facts and Procedural History

The plaintiff, Central Louisiana Electric Company, Inc. (CLECO) is a public utility company engaged in the business of generating, transmitting and distributing electricity. CLECO generates electricity by means of steam powered turbine generators. A general understanding of the manner in which a turbine generator operates is necessary in order to appreciate the nature of the plaintiff's claims under the policy issued by the defendants.
Simply stated, steam enters through a valve in the middle portion of the unit and passes through a series of blades which revolve at a rate of 3,600 revolutions per minute. The steam exits the unit at both ends. One end of the unit is referred to as the governor end and the other is known as the generator end. The blades in the last ring on each end of the unit are called the L-0 blades. The adjoining inner ring of blades are designated as the L-1 blades. The L-1 blades are grouped in threes and are attached by a strip of metal called a shroud. The portion of each blade which fits into the shroud is termed the tenon.
On June 2, 1982, an alarm sounded at the CLECO generating station in Baldwin, Louisiana indicating the turbine generator unit had sustained high vibrations. Consequently, the unit was shut down. A preliminary internal investigation conducted by CLECO and Westinghouse (the manufacturer of the unit) revealed a portion of an L-1 shroud had broken and struck other blades located in the governor end of the unit. Specifically, fourteen blade clusters of the governor end L-1 blade ring and three blade clusters of the governor end L-0 blade ring were damaged by the broken segment. These blades were removed and new blades were installed. It is undisputed that the cost of replacing these specific blades damaged as a result of the June 2 incident was within the deductible of CLECO's boiler and machinery insurance policy.
After the preliminary investigation, CLECO asked Westinghouse to conduct a more detailed examination of the unit to determine the root cause of the June 2 shut down. A metallurgical analysis was performed on eleven L-1 blade groups removed from the governor end of the unit. The analysis revealed corrosion assisted cracking which initiated at corrosion pits in nine of the thirty-three tenons examined.[1] Additionally, corrosion pitting was documented on several shrouds. The corrosion pitting found in two locations was of the "generic" type peculiar to the Westinghouse L-1 blades.[2]
On the basis of its findings, Westinghouse recommended that CLECO replace both rings of L-1 blades (governor and generator) with "free-standing" non-shrouded blades because it was believed the collection of impurities at the blade tips would eventually cause severe damage to the rest of the equipment.[3] Based on the report provided by Westinghouse, CLECO decided to replace all the L-1 blades located at both ends of the unit with "freestanding" blades at a cost of $838,077.07 in *984 order to prevent future damage to the machinery.
CLECO subsequently sought payment for the replacement of these blades under the boiler and machinery insurance policy issued by the various defendant-underwriters. The underwriters denied CLECO's claim based upon findings that the replacement of all the L-1 blades located in the unit was not necessitated by the June 2 accident. Specifically, the underwriters denied coverage because the policy expressly excluded corrosion damage from the definition of "Accident."
In May of 1983, CLECO brought suit against Westinghouse Electric Corporation [4] and several insurance companies and underwriters believed to have issued the policy in question. Subsequently, CLECO and Westinghouse entered into a settlement agreement and Westinghouse was dismissed from the suit on February 2, 1985. Pursuant to a pre-trial stipulation, the parties agreed on the proper party defendants to the action.
The trial court found the insurance policy provided coverage for the replacement of all the L-1 blades located in the unit. Specifically, the trial court stated: "[T]he decision to replace all blades of the L-1 turbine was based upon the accident of June 2, 1982." Consequently, the trial court awarded CLECO damages in the amount of $424,827.07.[5] The trial court also found the defendants had acted arbitrarily and capriciously in refusing to pay the plaintiff's claim. Consequently, the court awarded penalties equal to 12% of the damage award and attorney's fees equal to one-third of the damage award.
The Court of Appeal, First Circuit reversed. The appellate court held the policy did not provide coverage for the replacement of the L-1 blades damaged due to corrosion because corrosion is explicitly excluded from the types of events which trigger coverage under the policy. 569 So.2d 120. Because the appellate court found the policy did not provide coverage, it did not address the issues of penalties, attorney's fees or legal interest.
We granted writs to review the lower court decisions.

II. Analysis
In order to resolve this lawsuit, an examination of the language and terms used in the boiler and machinery policy which is the subject of this dispute is necessary. The relevant provisions of the policy are as follows:
INSURING AGREEMENT
The Company hereby agrees with the named Insured respecting loss from an Accident as defined herein, as follows: COVERAGE APROPERTY OF THE INSUREDTo pay the Insured for loss or damage to property of the Insured directly caused by such accident to an Object, including loss or damage to property of the Insured consisting of accounts,... or securities directly caused by such Accident to an Object.
* * * * * *
DEFINITION OF ACCIDENT
1. Unless otherwise provided herein, "Accident" shall mean any sudden and accidental occurrence to the Object, or part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of materials, (b) wear and tear,....
It is undisputed the damage to the fourteen blade clusters of the L-1 blade ring and the three blade clusters of the L-0 blade ring discovered during the preliminary inspection was caused directly by the failure of the L-1 shroud which precipitated the June 2 shut down. Because the cost of replacing these blades was within the deductible of CLECO's boiler and machinery *985 insurance policy, the issue of coverage as to these blades alone is not at issue.
The crucial issue presented by this case is whether the policy language covers the cost of replacing all the L-1 blades located at both ends of the unit with "free-standing" nonshrouded blades. CLECO admits the cost of replacing corroded blades is not covered under the policy. However, CLECO argues the resulting cracks and damage caused by corrosion are not "corrosion" and thus are covered under the policy language. It is CLECO's contention that the policy at issue is ambiguous and that the appellate court erred in broadly extending the term "corrosion" to include cracks caused by corrosion. In response, the defendant-underwriters argue the policy unambiguously provides coverage only for damages directly caused by sudden and accidental occurrences and specifically excludes coverage for damages resulting from corrosion.
For the following reasons, we find no merit in CLECO's position. In interpreting the boiler and machinery policy at issue, we are guided by certain elementary principles of construction. When the language in an insurance contract is clear and unambiguous the agreement must be enforced as written. Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988). An insurance contract is to be construed as a whole, and one part thereof should not be construed separately and at the expense of disregarding other sections or provisions. Benton Casing Service, Inc. v. Avemco Ins. Co., 379 So.2d 225 (La.1979).
Based on our review of all the pertinent policy provisions, it is apparent that CLECO has failed to read the relevant policy provisions dealing with recovery for loss or damage in their entirety. When the various provisions of the policy related to damage or loss to property are read as a whole, there is no ambiguity in the policy language or terms.
The policy expressly provides coverage "for loss or damage to property of the Insured directly caused by [an] accident to an Object." Thus, coverage depends on whether the damaged condition of the L-1 blades was "directly caused" by an accident.[6] Our review of the record establishes the alleged damage to the L-1 blades which were replaced consisted of corrosion assisted cracking.[7] Thus, our first inquiry must be into the "direct cause" of this cracking.[8] If the peril that directly caused the damage is one of the particular perils insured against,[9] the policy provides coverage. On the other hand, if the direct cause of the damage is not one of the specific risks insured against, coverage is precluded.[10]
Ms. Sallie Bachman, a metallurgist employed by Westinghouse, established the cracks were caused when the corrosion pits, which act as stress concentrators, were subjected to repeated applications of stress. Specifically, Ms. Bachman testified *986 "the cracks initiated at corrosion pits and then propagated by high cycle fatigue." Based on this testimony elicited from the plaintiff's own expert witness, it is clear the "direct cause" of the damage was the existence of corrosion pits coupled with the constant stress which was exerted on the metal. Obviously, the cracks would not have occurred had the blades not been weakened by the existence of pitting corrosion.
Having established the direct cause of the damage, the plaintiff has the burden of proving the corrosion pits and/or the stress are "accidents" as defined by the policy.[11] CLECO makes no argument that the two factors which caused the cracking are "accidents." Instead, CLECO attempts to argue the cracks themselves are "sudden and accidental occurrences." In essence, CLECO presents a circuitous argument that the damage sustained by the blades which required replacement (cracking) was caused by a sudden and accidental occurrence (cracking). We refuse to validate CLECO's argument, because acceptance of such an argument would defeat the purpose and intent behind the policy.
Our dismissal of CLECO's attempt to fit its claim within the policy language by arguing that the cracks themselves are "accidents," requires us to determine whether the two factors which directly caused the cracking are "accidents." The policy defines "accident" as "any sudden and accidental occurrence to the Object, or part thereof, which results in damage to the Object and necessitates repair or replacement." Specifically and expressly excluded from the definition of "accident" is any "depletion, deterioration, corrosion, or erosion of material."
Words and phrases used in insurance policies are to be construed in their plain, ordinary and popular sense. Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72 (1939). Construing the words used to define "accident" according to their generally understood meanings, we find no ambiguity in the policy language. The term "sudden" as defined in Webster's Third New International Dictionary means "happening without previous notice or with very brief notice; coming or occurring unexpectedly; not foreseen or prepared for." The word "accidental" is defined in Webster's as "occurring sometimes with unfortunate results by chance alone."
With the above definitions in mind, we find corrosion pitting is clearly not an "accident." Corrosion pitting forms slowly and gradually. The record establishes the corroded condition of the generator blades occurred over the entire period of their operation in the corrosive environment. Furthermore, the record indicates that as of 1978, CLECO was aware of the corrosive influences of the various materials used in generating steam and had been warned by Westinghouse that all L-1 blade tips, due to a specific problem with blade design, were subject to the generic tenon cracking problem.[12] Consequently, because corrosion pitting forms gradually and was a predictable and known event associated with this particular blade configuration, it cannot be considered a "sudden and accidental occurrence." Moreover, corrosion pitting is simply one of many forms of corrosion.[13] Because "corrosion" is expressly excluded from the definition of "accident," corrosion pitting would likewise be excluded.
As the final step in our analysis we must determine whether the stress exerted on the metal blades was an "accident" as defined by the policy. It would be nonsensical to conclude the stress to which the metal blades were subjected was a "sudden *987 or accidental occurrence." Stress is an existing force within the blade material which is present from the moment the blades are manufactured. In addition, the record contains testimony given by Ms. Bachman which indicates there is always stress on the blade components and that stress does not happen suddenly. As a result, we find the stress which in part caused the blade cracking was an anticipated and foreseeable ongoing occurrence which could not possibly be characterized as accidental in nature.
Based on our examination of the applicable policy language and the facts as presented in the record, we hold the policy issued by the defendant-underwriters does not provide coverage for the cost of replacing the entire L-1 blade unit. The cracks and corrosion pitting found in the blades were directly caused by the combination of stress and corrosion.[14] Neither of these factors can be characterized as a "sudden or accidental occurrence" which was insured against.
In reaching our conclusion, we considered CLECO's contention that the appellate court's decision leads to an anomalous result. CLECO attacks the passage contained in the court of appeal's opinion which states damage directly caused by corrosion is not covered under the policy but damage indirectly caused by corrosion is covered. We are in complete agreement with our brethren of the First Circuit. As stated previously, the policy issued to CLECO provides coverage for damage and loss directly caused by an accident. Thus, if corrosion is the proximate or direct cause of damage or loss to an object, the policy does not provide coverage because corrosion is not included within the definition of accident. In contrast, if corrosion is a direct cause of a sudden and accidental occurrence which in turn directly causes damage (i.e. corrosion is only an indirect cause of the damage) the damage is covered because the proximate cause of the damage is a risk covered by the policy. It is for this very reason that damages occasioned by an accident such as the one which occurred on June 2 are covered under the policy.[15]

III. Conclusion
In summary, our application of the policy language to the particular facts of this case leads us to conclude the boiler and machinery insurance policy issued to CLECO does not provide coverage for the cost of replacing the entire blade unit damaged by the existence of corrosion pits and consequential cracks. The factors which directly caused the deteriorated condition of the L-1 blades were not risks which were insured against under the policy. Accordingly, we agree with the court of appeal's finding that coverage was not provided under the facts presented in the instant case.
AFFIRMED.
DENNIS, J., dissents with reasons.
WATSON, J., dissents.
NOTES
[1] The L-1 blades located at the generator end of the unit were not examined metallurgically by Westinghouse because the removal of the shrouds to examine the tenons metallurgically would have destroyed the blades. A subsequent imprecise ultrasonic test performed at CLECO's request by Reinhart and Associates, Inc. verified the existence of cracks in the generator end.
[2] "Generic" pitting is defined by Westinghouse as a specific type of pitting wherein the metal actually dissolves. "Generic" pitting only occurs in the particular combination of metals used in the L-1 blades.
[3] In addition to this recommendation, CLECO considered the following four alternative courses of action as possible solutions to the generic pitting problem:

1. Replace only the blades which had been directly damaged as a result of the June 2 accident;
2. Test the tenon heads of all L-1 blades ultrasonically and replace only those with cracks;
3. Remove the L-1 rotating and stationary blades and install a baffle;
4. Remove and replace all "old" L-1 blades with new L-1 shrouded blades.
The above options were discarded because they did not offer a long term solution to the generic pitting problem associated with the shrouded L-1 blades.
[4] CLECO's claim against Westinghouse alleged a design defect.
[5] The trial court based the damage award on the total cost of repairs less the deductible. It appears the trial court erred in calculating the damage award. Based on our calculations, the amount awarded by the trial court should have been $424,327.02 ($838,077.07 - $413,750.00).
[6] We stress the importance of the particular language contained in the policy in question to the resolution of this dispute. Both parties have cited cases from other jurisdictions involving similar factual situations in support of their respective positions; however, because the policy language at issue is unlike the language in those cases, reliance on those cases is misguided. See, e.g., Lakeshore Marine, Inc. v. Hartford Accident and Indemnity Co., 164 Ga.App. 417, 296 S.E.2d 418 (1982) (policy at issue did not explicitly exclude damage caused by a sudden and accidental occurrence resulting from corrosion); Cyclops Corp. Home Insurance Co., 352 F.Supp. 931, 936 (W.D.Pa.1973) (policy definition of "accident" does not require any consideration of the term "cause").
[7] We note that only nine of the thirty-three tenons tested actually had sustained damage in the form of corrosion assisted cracking. The remaining blades tested merely suffered from corrosion pitting.
[8] The word "direct" as used in a contract insuring against direct loss or damages means immediate or proximate as distinguished from remote. Lorio v. Aetna Ins. Co., 255 La. 721, 232 So.2d 490 (1970).
[9] The perils insured against under this particular boiler and machinery policy are defined as "accidents."
[10] See generally, Annotation, Boiler and Machinery Insurance: Risks and Losses Covered by Policy or Provision Expressly Covering Boilers and Machinery, 49 A.L.R.4th 336 (1986).
[11] In an action on an insurance policy, the insured has the burden of proving facts which bring his claim within the coverage of the policy. Turner v. Ewing, 255 La. 659, 232 So.2d 468 (1970); C.L. Morris, Inc. v. Southern American Ins. Co., 550 So.2d 828 (La.App.2nd Cir.1989); Oliver v. Saia, 510 So.2d 770 (La.App. 1st Cir. 1987), writ denied, 514 So.2d 463 (La.1987).
[12] The L-1 blade configuration inhibited the free flow of steam across the surface of the tenon and resulted in the build up of corrosion between the shroud and tenon.
[13] Hoey, The Meaning of "Accident" in Boiler and Machinery Insurance and New Developments in Underwriting, 19 Forum 467, 473 (1984).
[14] To be exact, the "generic" pitting found in two locations was directly caused by the combination of stress and the particular metal composition of the blades.
[15] Technically, the specific blade which fractured on June 2 as a result of corrosion would not be covered under the policy because corrosion would be the direct cause of that fracture. However, any downstream damage occurring to surrounding machinery as a result of the fractured blade would be covered under the policy because such damage would be directly caused by an accident (the fracturing of the blade) rather than by the more remote indirect cause (the corrosion).