REVISED June 21, 1999

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-30635
_____

THE PRYTANIA PARK HOTEL, LIMITED;
ALVIN HALPERN; THEONE M. HALPERN,

Plaintiffs-Appellees,

versus

GENERAL STAR INDEMNITY COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

June 17, 1999

Before GARWOOD, JONES, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

At the core of this appeal are insurance claims for property damage and business interruption loss attributable to a fire at the Prytania Park Hotel ("the Hotel") in New Orleans, owned by Plaintiffs-Appellees ("the Halperns"). The insurer of the Hotel, Defendant-Appellant General Star Indemnity Company ("General Star"), appeals the district court's denial of its motion for a judgment as a matter of law ("JML") or, alternatively, a new trial. General Star grounds its appeal in numerous assignments of error that it claims adversely affected the jury trial, the resulting verdict, and ultimately the judgment in this case.

A principal bone of contention is the district court's pre-

trial grant of a partial summary judgment in favor of the Halperns. The court held that fire-damaged, custom-made furniture, which was attached by screws or bolts to the walls of guest rooms in the Hotel ("the Furniture"[1]), were "[p]ermanently installed: [f]ixtures...," a category of movable property that is listed in the **COVERAGE** provision of General Star's policy ("the Policy") among those that are components of the "**Building.**" The Policy differentiates between loss to the **Building** and loss to the insureds' **"Business Personal Property."** By treating the Furniture as permanently installed fixtures, the court eschewed the possibility that it could be "[f]urniture and fixtures" which, in the **COVERAGE** provision, are listed among the types of movables that are components the insureds' **Business Personal Property**. The practical effect of this holding, when incorporated by the trial court into its jury instructions, was to cause the Furniture to be valued at its full replacement cost rather than at its actual cash value as used hotel furniture on the second-hand furniture market. Consistent with this ruling, the jury was instructed to include the Furniture under the Policy's coverage for loss or damage to the **Building** ("the building claim") —— and to use the new, replacement value of the Furniture in calculating any award of damages for its loss —— rather than under the Policy's coverage for loss or damage to the insureds' **Business Personal Property**, i.e., the contents of the Hotel ("the contents claim"), at actual cash value.

---

[1] The Furniture comprised armoires, night stands, entertainment centers/chests of drawers, desks, wall mirrors, and hanging luggage racks.

We conclude that in granting this partial summary judgment the district court erred as a matter of law in several respects: first, when it implicitly rejected General Star's legal contention that the Furniture was not "fixtures" for purposes of the Policy; second, when it explicitly ruled that the question whether removal would cause substantial damage to the Furniture or to the Hotel was not material; and third, when it granted the partial summary judgment holding that, for purposes of the insurance coverage provided by the Policy, the Furniture was permanently installed fixtures, not furniture and fixtures, and thus compensable under the building claim at replacement value. Our de novo review leads us to the opposite result, which we reach in alternative holdings: (1) The Furniture was not "fixtures" for purposes of the building claim; but (2) if we assume arquendo that the Furniture is "fixtures," it was not "permanently installed" and therefore not includable in the building claim. Either way, then, the Furniture is covered by the Policy only as "[f]urniture and fixtures," an element of the Halperns' **Business Personal Property**, compensable at market value under the contents claim. We therefore reverse the partial summary judgment which, when translated into a jury instruction, produced an excessive jury award and thereby constitutes reversible error. Unfortunately, given the generality of the jury's non-itemized, global damages awards on both the building claim and the contents claim, neither we nor the district court on remand is able to remedy the effects of this error by rendering a modified judgment as to the building and contents

3

claims. We are thus left no choice but to vacate the judgment of the district court on the building and contents claims and remand this case for a new trial, consistent with this opinion, on the entirety of those claims. Finding no reversible error in connection with the jury's business interruption award, however, we affirm that aspect of the district court's judgment.

I.

FACTS AND PROCEEDINGS

The Hotel sustained a fire that caused extensive damage to one of its several buildings and to contents and component parts of that building. The fire interrupted the Hotel's business operations as well. The Hotel was insured under the Policy, which provided coverage for (1) loss or damage to the **Building**, defined as including, <u>inter</u> <u>alia</u>, "[p]ermanently installed: [f]ixtures; [m]achinery; and [e]quipment," compensable at replacement value; (2) loss or damage to the insureds' **Business Personal Property**, defined as including, <u>inter</u> <u>alia</u>, "[f]urniture and fixtures," compensable at actual cash value; and (3) loss of "[b]usiness income" resulting from business interruption from the time of the fire until the insureds should "as quickly as possible" resume operations.

The Halperns submitted (1) the building claim for $276,687.96, covering the damaged hotel building, including in it all the Furniture as "[p]ermanently installed: [f]ixtures" at full replacement value; (2) the contents claim for $85,888.10, covering business personal property, but not including any of the Furniture

**4**

in it; and (3) the business interruption claim for $75,000.00, covering loss of income resulting from interrupted occupancy and operations. Following completion of the adjusting process, General Star paid $186,448.47 on the building claim, which payment did not include anything for the Furniture; $68,273.93 on the contents claim, which included the Furniture at market value under the "[f]urniture and fixtures" element of the Halperns' **Business Personal Property**, and $34,988.00 on the business interruption claim. As these payments totaled less than the aggregate amount sought, the Halperns filed this declaratory judgment and breach of contract action seeking to recover those portions of their claims that remained unpaid.

During the course of the proceedings prior to trial, the Halperns and General Star filed cross-motions for summary judgment on several issues, including the proper classification of the Furniture. The district court granted the Halperns' partial summary judgment, as described above, and ultimately instructed the jury accordingly.

As fate would have it, this particular issue was addressed, seriatim, by three different judges of the Eastern District of Louisiana, the first of whom died after granting the partial summary judgment, and the remaining two of whom, in turn, declined to amend or revise it. All three judges concluded that the Furniture should be categorized as "[p]ermanently installed: [f]ixtures," thus bringing it under the building claim and making it compensable by General Star at full replacement value.

5

On appeal, General Star advances numerous assignments of error regarding the district court's preliminary rulings and its conduct of the trial, including evidentiary rulings and jury instructions. All such claims of error, save the ones attacking the partial summary judgment that held the Furniture to be permanently installed fixtures, become moot for purposes of this appeal in light of our determination that the court's grant of the Halperns' partial summary judgment on the Furniture must be reversed and the case remanded for a new trial on the entirety of the building and contents claims.[2] The only survivor of our partial vacature of the district court's judgment, and our reversal and remand, is that portion of the court's final judgment that implements the jury's award of damages for business interruption, which portion we address briefly below and affirm.

## II.

## Analysis

A. <u>Standard of Review</u>

The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law.[3] Under our well known standard, we review summary judgment rulings

---

[2] For the same reason that neither we nor the district court can cure this matter with a modified judgment, the other items included in the building and contents claims must be dealt with in a new trial, including, <u>inter</u> <u>alia</u>, the disputes regarding the telephone system, laundry equipment, and improvements required by the applicable building codes.

[3] <u>Mitchell v. Lone Star Ammunition, Inc.</u>, 913 F.2d 242, 252 (5th Cir. 1990).

<u>de</u> <u>novo</u>, applying the same criteria as does the district court.[4]

B.  **The Furniture: "Furniture and Fixtures" or "Permanently Installed Fixtures"?**

1.  <u>District Court's Grant of Partial Summary Judgment</u>

The first of the three district judges to address the central issue of this diversity case started correctly by turning to Louisiana law.  Rather than beginning with the Civil Code, though, the court quoted the Louisiana Supreme Court's opinion in <u>Pareti v. Sentry Indemnity Co.</u>[5] for the general truisms that an insurance policy is a contract like all others, is the law between the parties, is enforceable as written, and is to be construed as a whole without interpreting one portion alone while disregarding another.  The district court nevertheless failed to construe two key provisions of the Policy <u>in</u> <u>pari</u> <u>materia</u> or in the context of either the Policy as a whole or its entire **COVERAGE** provision. Instead, the court proceeded next to center its attention on another Louisiana Supreme Court pronouncement that "[w]ords and phrases used in insurance policies are to be construed in their plain, ordinary and popular sense."[6]  This appears to have led the court to disregard entirely the phrase "[f]urniture and fixtures" in the **COVERAGE** provision's **Business Personal Property** section, and to focus solely on the phrase "[p]ermanently installed: [f]ixtures" in the **COVERAGE** provision's **Building** section, where these items are

---

[4]  <u>Conkling v. Turner</u>, 18 F.3d 1285, 1295 (5th Cir. 1994).

[5]  536 So. 2d 417 (La. 1988).

[6]  <u>Central La. Elec. Co. v. Westinghouse Elec. Co.</u>, 579 So. 2d 981, 986 (La. 1991).

specified components of the **Building**.  Significantly, the court never even indicated an awareness that (1) the word "fixtures" appears in both sections, but (2) the word "furniture" appears in only one, the **Business Personal Property** section.

Continuing down this path, the court then proceeded to look to nothing other than the dictionary definitions of the three words that comprise the phrase "permanently installed fixtures" — and to do so wholly out of context.[7]  Additionally, this first district judge placed substantial emphasis on the uncontested fact that the Furniture was "'custom-built' for each room of the hotel...," even though that isolated fact is not material to the central issue under consideration.[8]

Despite observing that there was "disagreement as to whether removal of the furniture would damage the hotel rooms and/or the extent of such damage," the court nevertheless held that "that dispute is immaterial to the Court's decision."  As will be shown, however, the issue of removal damage is not just material to our

---

[7]  Selecting Webster's II New Riverside University Dictionary (1994) as its sole source, the court observed that "permanent" is defined as "lasting or meant to last indefinitely"; that "install" is defined as "to set in position or adjust for use"; and "fixture" is defined as "something securely fixed in place."

[8]  The court did note correctly, however, that one of the Halperns misspoke in referring to the Furniture as "built-in," which it clearly was not.  Rather, it is undisputed that the custom-built furniture, sometimes referred to by the court and the parties as "modular furniture," was designed for particular locations, was fabricated off premises, and was assembled as free-standing units inside the hotel, where it was then placed in its intended locations and bolted or screwed to the walls of the hotel rooms as free-standing units without ever losing its identity separate from the Hotel.

alternative reasons for concluding that the partial summary judgment was not providently granted; it is the nub of the question. The genuineness of this dispute is another matter: Its absence will loom large in our alternative reasoning, and ultimately alleviate the need to remand the case for additional factual findings regarding the extent of removal damage, requiring us instead to reverse the district court's grant of the Halperns' motion for summary judgment and to grant General Star's cross motion that, as a matter of law, the Furniture was not permanently attached to the Hotel.

The second of the three district judges to consider categorization of the Furniture did so in the context of a Motion to Amend the Partial Summary Judgment, and the third did so in the context of a Motion to Amend Order. Like Sisyphus rolling his stone up the mountainside, General Star's repeated efforts to get the district court to consider the importance of the juxtaposed phrases "furniture and fixtures" and "permanently installed fixtures," in the context of the Policy's **COVERAGE** provision, never made it to the top. Neither was General Star able to get the court to consider the permanence of the Furniture's attachment to the walls of the Hotel — more precisely, the extent of the damage that removal would cause — in the court's deliberations on whether the Furniture should be covered under the building claim or the contents claim.

2.   De Novo Review of Partial Summary Judgment

Our de novo review convinces us that the district court missed

the mark all three times. First, the court erred when it rejected General Star's insistence that the meaning of "fixtures" should be considered in the context of the Policy as a whole, particularly the entirety of the **COVERAGE** provision where that word is used twice under distinguishable circumstances, once in connection with the building and once in connection with the contents. Second, the court erred when it deemed the physical nature of the Furniture's installation immaterial, particularly the issue of the extent of damage that removal would cause to the Furniture and the walls to which it was attached. Third, the court incorrectly concentrated on (1) the Halperns' subjective intent to have the Furniture placed indefinitely or permanently in a particular location within particular hotel rooms, and (2) the "custom-made" nature of the Furniture. Erroneously assigning probative value to these two factors appears to have led the court improvidently to grant, and twice sustain, the partial summary judgment erroneously classifying the Furniture as "[p]ermanently installed: [f]ixtures" and thus as items covered under the building claim.

a. Interpretation of the Policy

It is axiomatic that in Louisiana, courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes. Jurisprudence, even when it rises to the level of jurisprudence constante,[9] is a secondary law source in Louisiana. When the analysis calls for interpreting a

_____

[9]    See Alvin B. Rubin, Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad, 48 La. L. Rev. 1369, 1372 (1988).

contract, the Louisiana Civil Code is the starting point. In it, the methodology for contractual interpretation is set forth in Chapter 13 of Title IV, Book III, consisting of articles 2045 through 2057. Although the initial article of Chapter 13 defines "[i]nterpretation of a contract" as "the determination of the common intent of the parties,[10]" the official 1984 Revision Comment makes clear that such intent is objective in nature, i.e., "what the parties must have intended, given the manner in which they expressed themselves in their contract,"[11] not what one or the other might say that he intended. The Code is quick to add, in the next succeeding article, that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[12] Clearly, that was the situation faced by the district court in this case and faced now by us.

The second district judge to consider the central issue of contract interpretation made mention of article 2047's directive that "[t]he words of a contract must be given their generally prevailing meaning."[13] He stopped prematurely, however, when he failed to consider article 2050's mandate that "[e]ach provision in

---

[10] La. Civ. Code Ann. art. 2045 (West 1999)(emphasis added).

[11] Id. cmt. b.

[12] La. Civ. Code Ann. art. 2046 (West 1999).

[13] La. Civ. Code Ann. art. 2047 (West 1999); see Pareti, 536 So. 2d at 420 (noting that an insurance policy is a contract governed by the substantive rules of conventional obligations); see also Central La. Elec. Co., 579 So. 2d at 983.

a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[14]  This rule of interpretation, coupled with the corollary that "[a] doubtful provision must be interpreted in light of the nature of the contract...,"[15] lucidly establishes the framework for construing the Policy.

Using the methodology of the Civil Code, we must analyze the **COVERAGE** provision of the Policy to determine whether its clear and explicit words, when interpreted in light of all its provisions so as to give each the meaning suggested by the contract as a whole and in light of the nature of the contract (commercial insurance), reveal the objective purpose of the agreement and produce no absurd consequences.  To do so, we turn to the plain meaning of the language in the Policy's **COVERAGE** subsections —— **a. The Building**, and **b. Your Business Personal Property** —— to ascertain whether the Furniture is a component of the **Building**, entitling the Halperns to full replacement cost, or an element of the Halperns' **Business Personal Property**, entitling them to actual cash value only.

b.    Furniture Qua "Furniture"

Despite General Star's repeated entreaties, the district court never got past the out-of-context dictionary definitions of the words "fixtures," "permanently," and "installed," to interpret the Policy in general and its **COVERAGE** provision in particular. Although the three defined words are neither technical terms nor

---

[14]   La. Civ. Code Ann. art. 2050 (West 1999).

[15]   Id. art. 2053.

**12**

words of art, and thus must be given their generally prevailing meanings, the Civil Code commands that words be given those meanings in the context of the contract as a whole —— not in isolation or in a vacuum. This contract is one of commercial insurance involving the Halperns' hotel property and business;[16] it is not, for example, a residential policy issued by a sophisticated insurance company to an inexperienced lay homeowner. Thus, the combination of an insurance contract covering a hotel property essentially places these commercially sophisticated parties in legal equipoise, General Star possessing expertise in matters of insurance and the Halperns possessing expertise in matters of hotel ownership and operation.

When we conduct such a contextual analysis, we discern a contractual dichotomy between the Policy's building coverage and its contents coverage: Permanently installed <u>fixtures</u> covered under the building and all other <u>fixtures</u> covered under the contents. From our reading of the **COVERAGE** provision as a whole, a clear scheme emerges: The first subcategory of movable property included in the definition of **Business Personal Property** is "Furniture and <u>fixtures</u>"; the second subcategory of movable property included in the definition of the **Building** is "Permanently installed: (a) <u>Fixtures</u>; (b) Machinery; and (c) Equipment." Thus, under the words of the Policy, the answer to the question, which "fixtures" are includable in the building claim and which are includable in the contents claim, turns entirely on the permanence of their

---

[16]   <u>See</u> <u>id.</u>

installation —— anything but an immaterial question of fact.

In marked contrast to this _dual_ role of "fixtures" in the Policy's **COVERAGE** provision is the _singular_ role of "furniture" in that provision.  Like fixtures, _furniture_ is a specified element of **Business Personal Property**; but, unlike fixtures, _furniture_ is _not_ a specified element or component of the **Building**.  Indeed, the word "furniture" is nowhere to be found in the lengthy but clearly exclusive list of the kinds of movables that can be components of the **Building**.  The structure of the Policy, juxtaposing fixtures and furniture, leads to the following conclusions:

> (1) The conjunctive phrase "Furniture and fixtures" in the **COVERAGE** provision's **Business Personal Property** section demonstrates that "furniture" and "fixtures" are two different categories of corporeal movable (personal) property, each of which is an element of **Business Personal Property** and thus is includable in the contents claim;
>
> (2) _When "permanently installed"_ in the insured immovable (building), however, "fixtures" is a category of corporeal movables that is an element of the **Building**; but "furniture," whether or not permanently installed, is a category of corporeal movables that is neither expressly nor implicitly includable in the definition of the **Building**;
>
> (3) Therefore, given the _inclusion_ of "permanently installed _fixtures_" in the definition of the **Building** and the _exclusion_ of "furniture" from that definition, a building claim can never include "furniture." _Inclusio unius est exclusio alterius_.

This construction of the Policy produces a result that is anything but absurd.  The armoires, night stands, entertainment centers/chests of drawers, desks, wall mirrors, and hanging luggage racks that comprise the Furniture are quintessential articles of

**14**

furniture.  Indeed, they are never referred to by the Halperns, General Star, or the district court as anything but "furniture." Indisputably, then, each such item is, in common parlance, an article of furniture.

In contrast, fixtures in commercial establishments are movables that are attached to the premises, either temporarily or permanently, such as (1) "store fixtures" (display cases, shelving, check-out stands, etc.); (2) "bathroom fixtures" (sinks, toilets, tubs, showers, faucets, towel racks, etc.); (3) "kitchen fixtures" (ranges, ovens, icemakers, dishwashers, disposals, sinks, faucets, etc.); (4) "lighting fixtures" (ceiling lights, wall lights, track lights, etc.), to name but a few.  In and of itself, the single act of attaching an article of furniture to the wall (or floor or ceiling) of a hotel room cannot mystically convert such an article into a fixture, especially not in the context of the **COVERAGE** provision's dichotomy.

Our plenary review of the summary judgment evidence, the pertinent provisions of the Policy, and applicable pronouncements of Louisiana law satisfies us that the Policy (1) differentiates between "furniture" and "fixtures"; (2) includes both furniture and fixtures as categories of corporeal movables that are **Business Personal Property**; and (3) makes an exception for fixtures —— but not for furniture —— that are permanently installed in the insured commercial (hotel) building by shifting coverage of such articles from **Business Personal Property** to the **Building**.  Consequently, the custom-made articles that together comprise the Furniture are

"furniture," as distinguished from "fixtures," and as such remain **Business Personal Property** of the Halperns, regardless of their attachment to the walls of the Hotel, whether temporary or permanent. Under the obvious scheme of the **COVERAGE** provision and its building/business personal property dichotomy, the Furniture is includable only in the contents claim, not in the building claim.

c.    Furniture Qua "Permanently Installed:  Fixtures"

(i)  Permanence of Attachment

Notwithstanding the foregoing demonstration of how the Policy distinguishes between "furniture" and "fixtures" as separate categories of corporeal movables, if we assume arguendo that attachment to the walls of the Hotel could somehow convert furniture to fixtures, the Furniture still could not be included in the building claim for one indisputable reason: Its attachment to the building was not "permanent."  The summary judgment evidence confirms that there is no genuine dispute of fact about the permanence of the Furniture's attachment, the Halperns' subjective intent to the contrary notwithstanding.

No one disputes that the Furniture was custom designed, custom fabricated, custom assembled as free standing units, and installed at particular locations in particular guest rooms within the Hotel; it was not, however, "built-in."  Neither is it disputed that, at the time of design, the Halperns intended each piece to remain in its specific location within each guest room.  Neither the Halperns' preconceived notions of the particular locations where each item of furniture was to be installed, however, nor the

**16**

custom-made nature of the Furniture, is material to the question of the permanence of the attachment of such furniture.[17]  The district court's focus on the custom-made nature of the Furniture and on the Halperns' subjective intentions regarding its location and permanence, led the court astray.  For, even if we were to assume arguendo that the Furniture constitutes "fixtures," its includability in the building claim would turn not on whether the Halperns subjectively intended it to be installed "permanently," or on the fact that it was custom-made, but on whether its "installation" was "permanent."[18]

To answer this question, we construe the terms of the Policy the way we are instructed by the Civil Code to interpret any contract in Louisiana —— by considering the plain meaning of the language in the context of the contract as whole, and using the generally accepted meanings of the words that are not technical terms or words of art.  Applying these provisions of the Civil

---

[17]  We notice on our own that hoteliers regularly purchase standard, ready-made furniture, sometimes expensive and sometimes not, from manufacturers' "reps" or catalogues, and have it installed, either permanently or temporarily, just as they do with custom-made furniture.  Likewise, hoteliers regularly plan to install each item of furniture —— whether ready-made or custom-made —— in particular locations.  The point is that the finest and most costly furniture in the world, both antique and modern, is almost always custom-made yet is almost never attached and likely never considered to be "fixtures."

[18]  We cannot ignore the common experience of today's travelers who find virtually every item of movable (personal) property in a hotel room "nailed down" —— not just the beds, dressers, night stands, and TV sets, but lamps, clock radios, mini-bars, and remote controls for TVs as well.  Surely none would contend that these items are "permanently installed fixtures" rather than "furniture and fixtures."

Code, we attempt to ascertain the objective intent of the parties as reflected by the words they have employed in their agreement. We begin with Book II, Things and the Different Modifications of Ownership, specifically Title I: Chapter 1: Section 2, IMMOVABLES and Section 3, MOVABLES. In these sections, we find that immovables comprise (1) tracts of land,[19] (2) buildings and standing timber,[20] (3) movable things incorporated into immovables,[21] and (4) component parts of buildings or other constructions.[22] To complete the property continuum, we note that movables include (1) things that can be moved from one place or another[23] and (2) materials until they are incorporated into a building.[24] Somewhere along the continuum, between land and buildings on one end and free-standing, fully peripatetic corporeal movables on the other, lie movables that are either fully incorporated into the structure or permanently attached to it. Both of these categories of movables become "component parts" of the immovable, one by virtue of "incorporation,"[25] and the other by virtue of permanent attachment,

---

[19] La. Civ. Code Ann. art. 462 (West 1999).

[20] Id. art. 464.

[21] Id. art. 465 ("Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts.").

[22] Id. art. 466.

[23] Id. art. 471.

[24] Id. art. 472.

[25] Id. art. 465; Exposé des Motifs, Title I: Things, p. 11 (West 1980).

**18**

i.e., "immobilization."[26]

If the Furniture had been "built-in," i.e., had been constructed in the Hotel by sufficiently <u>incorporating</u> into the structure itself building materials that lose their separate identities and become integral parts of the building pursuant to article 465, the Furniture would have been a component part of the Hotel and thus includable in the building claim. There is no dispute, however, that such was not the case. Therefore, if the Furniture is to be accorded "fixture" status and, by virtue of permanent installation, to be included in the building claim, it must do so within the confines of article 466:

> Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
>
> Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.[27]

To test the Furniture under article 466 for possible inclusion in the building claim, we consider first the article's initial paragraph and its illustrative, <u>ejusdem generis</u> list of the kinds of movable things that Louisiana recognizes as being susceptible of component part status by virtue of permanent attachment. As the Furniture is not plumbing, heating, cooling, or electrical, it must qualify as "other installations" or be ineligible for component

---

[26] La. Civ. Code Ann. art. 466; <u>Exposé des Motifs</u>, Title I: Things at 12.

[27] La. Civ. Code Ann. art. 466.

part status under article 466.  And, not every "other" installation qualifies: An installation must be sufficiently similar to the four identified by name in article 466's illustrative list (plumbing, heating, cooling, or electrical) to come within the purview of the article by virtue of the ejusdem generis maxim.[28]

This presents the Halperns' first hurdle.  Each named type of installation is some kind of actively functioning machinery or equipment.  In contrast, the items that comprise the Furniture are passive, non-functioning articles.  We need not, however, and therefore do not, resolve the issue whether the Furniture can qualify as an article 466 "other installation."  Instead, we further assume arguendo that article 466's illustrative list can be read that broadly and proceed to address the permanence of the Furniture's attachment.  We do so because "[t]hings that are not permanently attached to a building or other construction remain movables."[29]

A straightforward reading of article 466 requires that the permanence of any movable's installation in "a building or other construction" meet the definition of "permanently attached" in the article's second paragraph.  Under that definition, the Furniture can only qualify as "[p]ermanently installed: [f]ixtures" if its

---

[28]  See Symeon Symeonides Developments in Business Law, 1984–85, 46 La. L. Rev. 655, 687 (1986)("[A]n item that meets the physical test of permanent attachment described in the second paragraph [of article 466] would not qualify as a component part, unless it falls into one of the categories of things enumerated in the first paragraph or [is] sufficiently similar ('such as') thereto." (emphasis added)).

[29]  La. Civ. Code Ann. art. 466, cmt. b.

removal would cause "substantial damage" to itself or to the Hotel.

In the partial summary judgment proceedings addressing the Furniture's classification, neither party contended that removal would substantially damage the Furniture itself; however, the Halperns did attempt to dispute General Star's contention that removal of the Furniture would not cause substantial damage to the walls of the Hotel. Our de novo examination of the summary judgment record convinces us that (1) the issue of "substantial damage" under article 466's permanent attachment test is material, but (2) as a matter of law, any dispute about the extent of removal damage is not genuine. As such, the district court should have granted General Star's motion for partial summary judgment on this point.

In his affidavit, Edward M. Halpern, General Manager of the Hotel, averred only conclusionally and without specific factual support, that removal would cause substantial damage to the walls of the Hotel. His bald assertion is unsupported by any details or factual underpinnings. In contrast, the affidavit of William A. Moulton, an adjuster retained by General Star, is specific and supported by discrete facts produced from his personal observations. He explained that the Furniture "could easily be removed from the hotel by detaching the bolts, and that removing the furniture in this way would not substantially damage either the furniture or the building." He confirms his firsthand observation, made during an inspection following the fire and after removal of the Furniture, which revealed the presence of no noticeable damage

to the Hotel from removal of the Furniture.

On summary judgment, we do not, of course, weigh the evidence or make credibility calls. We do, however, examine the evidence to determine whether factual disputes exist and, if so, whether they are genuine. Here, the Halperns supported their motion for partial summary judgment with nothing more than the single, conclusional and unsupported statement of Mr. Edward Halpern, speculating that reversing the screws that held the Furniture in place would cause <u>substantial</u> damage to the walls. Alone, this bare declaration is both counterintuitive and insufficient to create a <u>genuine</u> fact issue, particularly when compared to the adjuster's uncontradicted, firsthand account of his own inspection following the fire, which revealed, at most, superficial —— insubstantial —— wall damage had occurred when the Furniture was actually unbolted from the walls and removed.

We are satisfied that the summary judgment record reflects no genuine dispute on the material fact issue of substantial damage by removal: None would be expected and none in fact occurred. Thus, even if the Furniture could be considered to be "fixtures" under the Policy and an "other installation" for purposes of art. 466, it was neither permanently attached within the contemplation of that code article nor permanently installed within the contemplation of the **COVERAGE** section of the Policy. It follows that, even as "fixtures," the Furniture is not includable in the building claim.[30]

---

[30] This analysis is in accord with <u>Broadmoor Lumber Co. v. Liberto</u>, 162 So. 2d 800 (La. App. 4th Cir. 1964), which was decided before the adoption in 1978 of the current version of Civil Code

**22**

(ii) "Societal Expectations"

Presumably in recognition of their inability to demonstrate that removal of the Furniture would cause substantial damage to it or to the Hotel, the Halperns urge us in the alternative to disregard article 466's bright-line permanent attachment test and read our opinion in Equibank v. United States I.R.S.[31] as holding that this code article imported into Louisiana law, for the first time, a case-by-case "societal expectations" inquiry as the sole criterion for determining whether a corporeal movable is immobilized as a component part of the immovable to which it is attached, regardless of permanence. We are aware from Equibank that the societal expectations canon sprang —— or, more accurately, was launched —— full-grown from the forehead of an expert witness who testified for the I.R.S. during the trial of that case.[32] This

---

article 466. That case turned on whether custom-built furniture (cabinets) were "permanently attached" as a result of being screwed to a strip of plywood which itself was nailed to the studs of the store building through the plaster on its wall. Relying on former article 469, which current article 466 replaced without changing its substance (See La. Civ. Code Ann. art. 466, cmt. e, noting that former article 469 recognized that attached movables are components of the building if they "cannot be taken off without being broken or injured, or without breaking or injuring the part of the building to which they are attached," and further noting that "[t]he substance of this provision has been reproduced. Louisiana jurisprudence interpreting Article 469, therefore, continues to be relevant."), the court concluded that the custom-made cabinets could be removed from the commercial building in question "without damage to them or to the wall." The Broadmoor court therefore held that the cabinets had not become component parts of the store building.

[31] 749 F.2d 1176 (5th Cir. 1985).

[32] In Equibank, the I.R.S., as the holder of a tax lien that encumbered, inter alia, the taxpayers' New Orleans mansion, was pitted against the holder of a conventional first mortgage on the

expert witness was not, as might have been expected, a building contractor, electrical contractor, architect, or engineer, testifying about the extent of collateral damage that removal of the movables in question had caused. Instead, the witness was an expert on Louisiana property law,[33] who had served as the reporter on the Louisiana Law Institute's continuing revision project for the property articles of the Civil Code when the 1978 revisions to the subject Code articles were confected and adopted by the Legislature.

Notwithstanding the unambiguous wording of the revised version of article 466, the Professor urged the district court to hold that as a matter of law the antique chandeliers were not component parts of the mansion in which they had been installed but remained movable property. He did so, though, not by demonstrating that neither the chandeliers nor the ceilings of the mansion had suffered "substantial damage" during the course of removal. Rather, the Professor posited that, because of "societal expectations," such high-ticket items would not be expected by the hypothetical buyer or seller of such a mansion, or by the borrower or lender of a loan secured by a mortgage on such a mansion (or, we suppose, by the insurer or insured of such a mansion) to be

---

mansion. To prevail, the I.R.S. had to establish that several antique chandeliers were not component parts of the mansion and thus not encumbered by the mortgage, but instead remained separate movables and were therefore covered by the tax lien.

[33] Professor A. N. Yiannopoulos, Eason-Weinmann Professor of Law, Tulane University Law School, New Orleans, Louisiana (hereafter, "the Professor").

component parts of the mansion, regardless of the permanence or impermanence of the attachment of such chandeliers. From our opinion in Equibank, we get the impression that the Professor had opted to disregard the concept of permanent attachment as embodied in the plain wording of article 466 (a concept that presumably favored his client, given the apparent dearth of trial evidence of "substantial damage" to the chandelier or the mansion during removal) and to ground his advocacy instead on "societal expectations." He did so by an imaginative parsing of this article to visualize an otherwise invisible disjunctive between the article's first and second paragraphs.[34] Without even adverting to

---

[34] The pedigree of the Professor's "societal expectations" canon is murky at best. First, there is no harbinger of such a supervening theory in either the wording of article 466 or the extensive 1978 official Revision Comments accompanying that article. Neither are there clues elsewhere in the Louisiana Civil Code to suggest such a penumbral presence. True, the Exposé des Motifs — written by the Professor as the introduction to the 1978 revised version of the property articles of the Civil Code — makes one vague allusion to "prevailing ideas in society" but only in reference to historical Civilian approaches to the drafting of legislation that distinguishes between movables and immovables, not to the 1978 approach or its ultimate product. See Exposé des Motifs, Title I: Things at 9. Cutting against any thought that the Exposé des Motifs supports the injection of a societal expectations test interstitially into the law of Louisiana is the statement in the second sentence of the next-following paragraph to the effect that "[i]n contemporary civil law, the distinction rests, in principle, on physical notions of mobility and on 'inherent' characteristics of things." In addition to this "non-support" in the Exposé des Motifs, even the Professor's own treatise (Yiannopoulos, Property 2 LOUISIANA CIVIL LAW TREATISE § 22 (1980) — § 32 in the 1991 Third Edition of that Treatise) provides no support for the societal expectations test. In fact only the post-hoc effort of the Professor's fellow academician, Professor Symeon Symeonides of the L.S.U. Law faculty purports to support the proposition that in 1978 Louisiana had adopted the societal expectations theory, and even that writing fails to withstand careful scrutiny. Writing in the 1986 Louisiana Law Review in an effort to attribute adoption of the Yiannopoulos theory by the

the significance of the non-exclusive nature of the ejusdem generis list in the first paragraph of article 466 ("such as plumbing, heating, cooling, electrical or other installations"), the Professor cum expert witness interposed his take on the article: (1) Movables falling into one of the first paragraph's four nominate categories of installation are component parts as a matter of law, irrespective of the nature or extent of their attachment to the structure; (2) all installed movables other than plumbing, heating, cooling, or electrical are to be tested under the second paragraph of article 466 for permanence of installation hinging on whether they can "be removed without substantial damage to themselves or to the immovable to which they are attached."

---

panel in Equibank, Professor Symeonides begrudgingly acknowledges that a "literal reading" [What other kind of reading are we supposed to make?] of article 466 requires application of the "permanently attached" test to all installations, both the four nominate categories and all others that are "sufficiently similar ('such as') thereto." After thus tipping his hat to plain reading, however, Professor Symeonides goes on to describe the language of article 466 as "a poor choice of words" and to refer to Professor Yiannopoulos as "the drafter of the article." Neither statement is accurate: Although Professor Yiannopoulos was the reporter on the project, his and his Advisory Committee's version of the article was rejected by the Council of the Louisiana State Law Institute. As reflected in the official minutes of the meeting of the Council of the Institute on January 14, 1977, the Council rejected the Professor's version and adopted in its place a substitute version drafted instanter by Professor Carlos Lazarus of the L.S.U. law faculty. Anything but "unfortunate," the words were carefully chosen to implement the objective, permanent attachment criterion strongly favored by the Council. The Lazarus version, identical to current article 466, was included in the Institute's comprehensive revision package submitted to the Legislature and was adopted verbatim by the Legislature. Nothing in the minutes of that meeting of the Council of the Institute or of any of its other meetings at which the property revision project was discussed, reflects support for adopting a touchy-feely "societal expectations" test in lieu of the bright-line "substantial damage" test for permanent attachment and thus component part status.

Unlike the chandeliers in Equibank, though, which were electrical installations, the Furniture fits into none of the four categories of movables listed in the first paragraph of article 466, which categories the Professor considers components of the building as a matter of law.  Thus, even if Equibank were stretched to constitute our acceptance of the Professor's "societal expectations" spin on article 466,[35] it would avail the Halperns nothing: As the Furniture is not plumbing, heating, cooling, or electrical, but is — at most — "other installations," even the Professor, as the expert witness, would have us examine the Furniture not for societal expectations but for the extent of the damage, if any, that would result from removal.  As noted by the panel in Equibank:

> To complete the discussion, the Professor
> testified that the second paragraph of article
> 466 covered items other than those listed in

---

[35] Although Judge Politz's opinion in Equibank has been cited by other courts as this court's acceptance of the "societal expectations" methodology advocated by Professor Yiannopoulos, a careful reading of that opinion demonstrates anything but acceptance.  With the late Judge Rubin, another eminent Civilian scholar, on the panel, Judge Politz tipped his hat (1) to the unrelated mention of "prevailing ideas in society" in the Exposé des Motifs (which Judge Politz well knew, both from experience and from the first footnote in the Exposé des Motifs ("Neither the Exposé des Motifs nor the comments contained in Acts 1978, No. 728 are law.") are at most instructive), and (2) to the boot-straps reliance of the witness on his own theory.  Judge Politz then proceeded to turn that theory back on the Professor, demonstrating that the technical expertise needed to install or remove a fine chandelier — clearly an "electrical installation" — is such that, even under the societal expectation test, parties such as those in Equibank would expect the antique chandeliers to go with the mansion.  Implicitly, Judge Politz merely assumed arguendo the validity of the position advocated by the Professor and proceeded to reject his position even when using his own imaginative interpretation of article 466.

the first paragraph.  A second paragraph item was to be considered a component part only if its removal occasioned substantial damage to itself or to the immovable to which it was attached.[36]

Obviously, then, it is immaterial for purposes of today's alternative task of determining if the Furniture, as fixtures, is susceptible of inclusion under the building claim, whether we begin our testing under (1) the plain wording of article 466 (which looks solely to the extent of collateral damage that would result from removal), or (2) the Professor's creative "societal expectations" test (which, by his own testimony in Equibank, applies only to plumbing, heating, cooling, or electrical installations, and leaves all "other installations" to be tested for the permanence of attachment under the second paragraph of article 466 and its "substantial damage" test).  For, irrespective of which path we take, we arrive ultimately at the test for substantial damage on removal.  And, when we administer that test, the Furniture flunks: There is no genuine dispute that neither it nor the Hotel suffered substantial damage on removal.[37]

---

[36]  Equibank, 749 F.2d at 1178.

[37]  The only elasticity in art. 466's bright-line test for permanence of attachment lies in the adjective "substantial" which modifies "damage"; obviously, the question whether removal damage is substantial is a fact-intensive, case-by-case issue which must be decided in the context of the case. Still, the test in every case is whether removal damage is "substantial"; it can never begin with a "societal expectations" test that disregards removal damage altogether.  For example, some removal damage to a crane and to the offshore platform to which it is attached is to be "expected" in such an industrial context, and in fact was found not to be substantial by this court, see Coulter v. Texaco, Inc., 117 F.3d 909 (5th Cir. 1997).  Yet, those same damages would likely not be expected by owners, borrowers, buyers, sellers, and insurers of a

Translated into the equally clear and unambiguous language of the **COVERAGE** provision of the Policy, that contract, as the law between the parties, dictates that the Furniture — even if it can be "fixtures" — is not covered as an element of the **Building** unless it is "permanently installed." As the Policy contains no definition of "permanently," we must interpret that word's ordinary meaning, but in the context of the entire agreement and those of its provisions that work interdependently with the one in which the words are used. When we do, we conclude that the only objectively reasonable approach to interpretation is the one provided by article 466, under which, as we have demonstrated, permanence of attachment turns solely on the extent of any collateral damage that would occur on removal. Having concluded that there is no genuine dispute as to the material fact that removal damage, if any, would fall well short of "substantial," the conclusion is inescapable that the Furniture was not "[p]ermanently installed: [f]ixtures" and thus was not covered as a component of the **Building**. Rather, the Furniture is "[f]urniture and fixtures," and thus an element of the Halperns' "**Business Personal Property**." Clearly, then, the

---

fine residence, and would almost certainly be found to be substantial in the context of antique chandeliers and the ceiling of a mansion. This, however, is nothing more than garden-variety contextual judging, not judicial venturing into the subjectivity of societal expectations <u>ab</u> <u>initio</u>: Courts cannot ignore differences in context, such as the nature of the installation and the nature of the building or structure (chandeliers in a mansion vis-a-vis furniture in a hotel vis-a-vis an industrial crane on an offshore structure), when testing whether removal damage is substantial. Considering the "expectations" of the particular industry involved as to what is beyond normally anticipated removal damage is clearly distinguishable from ignoring removal damage altogether and looking to societal expectations alone to determine component part status.

district court should have granted General Star's motion for partial summary judgment to that effect. Exercising our plenary review of the parties' cross motions for summary judgment, we grant General Star's and hold that it owes the Halperns the current value of the Furniture on the used furniture market as of the date of the fire.

### 3.   Other Contested Claims

General Star complains that additional trial court errors infected the building claim as well as other claims of the Halperns' under the Policy. General Star advances purported errors in the court's treatment of overhead and profit in the repair work, and excessive or improper charges for millwork, sound board, electrical, air conditioning, plumbing, telephone system, and demolition. General Star also insists that the jury's award to the Halperns' for loss of income under the business interruption claim cannot be sustained, relying principally on differences in and purported problems with expert witnesses' testimony and calculations made in applying their proffered methodology.

Again, because we are unable to "fix" the quantum of the jury's awards for building and contents losses by merely reversing and rendering a modified judgment, we are constrained to vacate the judgment of the district court on those claims and remand for a new trial. Such a trial must resolve not only the amount of the Furniture loss but all other contested aspects of the contents and building claims as well. We therefore decline to wade in on General Star's complaints and assignments of error relating to

other aspects of the contents and building claims. Rather, as a prudential matter, we leave them for comprehensive analysis and an eventual jury verdict, when the case is retried in district court. We do not disturb, however, the facet of the district court judgment based on the jury's award of business interruption loss. Although General Star's allegations in this regard are non-frivolous, we cannot say that the state of the record is such that no reasonable jury could have reached the business interruption result reached by the jury in this case.[38]

## III.

## Conclusion

The district court's denial of General Star's motion for partial summary judgment and grant of the Halperns' motion for such a judgment, classifying the Furniture as permanently installed fixtures and instructing the jury to include them in the building claim, constitutes reversible error for the reasons set forth above. Given the non-itemized nature of the jury's awards on the building claim and the contents claim, any ability we might otherwise have had to correct these errors by rendering a modified judgment is stymied. We therefore vacate the judgment of the district court to the extent it awards damages under the building claim and the contents claim, and remand this case for a new trial

---

[38] See Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969)(en banc)("[I]f there is substantial evidence opposed to the motions [for a JML], that is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied...."), overruled on other grounds, 107 F.3d 331 (5th Cir. 1997).

on those claims, with instructions that the jury be charged that, as a matter of law, the Furniture is **Business Personal Property** of the Halperns and thus is compensable as used furniture, at its fair market value, as of the date of the fire.  All other aspects of the building claim and the contents claim shall be accorded fresh-start treatment in the new trial.  The district court's original judgment is affirmed, however, to the extent of its award to the Halperns for losses covered under the business interruption provisions of the Policy.

AFFIRMED in part; REVERSED and RENDERED in part, VACATED and REMANDED in part, for a new trial.