United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 15, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 02-31029

---

AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY,

Plaintiff-Appellee-Cross-Appellant,

versus

CANAL INDEMNITY COMPANY,

Defendant-Appellant-Cross-Appellee.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before HIGGINBOTHAM, STEWART, and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The central question presented by this diversity action is the effect, under Louisiana law, of

disparate "other insurance" clauses on the obligations of two automobile liability insurance carriers

to contribute to the payment of claims made by their common insured. The losses at issue, for

pollution-related damages and claims expenses, stem from two accidents involving insured diesel

transport trucks. Primary carrier Canal Indemnity Company ("Canal") appeals from the district

court's partial summary judgment ruling in favor of American International Specialty Lines Insurance

Company ("AISLIC") denying proration of the co-insurers' coverage responsibilities for the second accident. Canal also appeals the district court's determination that AISLIC's payment of the claim made for the first accident did not waive AISLIC's right to later rely on the terms of the same policy to contest its liability for the losses sustained by their insured. AISLIC cross-appeals the district court's entry of final judgment determining that it was not entitled to reclaim the sums it paid to Canal in contribution for the prior similar claim by the same insured for the first accident. Erie-bound, for the following reasons, we affirm the district court's rulings on the issues of allocation of coverage liability and waiver, reverse the district court's judgment denying reimbursement, and render judgment in favor of AISLIC.

## FACTUAL AND PROCEDURAL HISTORY

The pertinent underlying facts are undisputed. On December 14, 1998, an employee of Travis Fixed Based Operation and Service Corporation ("Travis") fell asleep while driving a Travis truck through Comal County, Texas, causing the truck to flip over and spill hundreds of gallons of diesel fuel, resulting in pollution and clean-up losses ("Comal County loss"). In June of 1999, another Travis truck driven by one of its employees was involved in a serious accident in Bexar County, Texas, also resulting in the accidental discharge of diesel fuel and leading to claims for pollution-related damages ("Bexar County loss"). Both accidents occurred during the effective periods of insurance policies issued by Canal and AISLIC in favor of Travis. Canal's policy provided "Basic Automobile Liability" coverage to Travis with a combined single limit of $1,000,000. Travis was also insured by AISLIC through a "Supplemental Environmental Automobile Liability" policy with a per occurrence and aggregate limit of $2,000,000 for any claims presented during the policy period.

2

Although both policies afforded coverage for the type of property damage, bodily injury, pollution-related damage, and claims expenses caused by the two accidents, each of the policies contained clauses purporting to limit or eliminate the insurers' respective liabilities in certain circumstances for losses covered by "other insurance."[1] Canal's policy contained a "pro rata" "other insurance" clause that provided in pertinent part:

> 6. Other Insurance: The insurance afforded by this policy is <u>primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance</u>. When this insurance is <u>primary</u> and the insured has <u>other insurance</u> which is stated to be applicable to the loss on an <u>excess or contingent basis</u>, the amount of the company's liability under the policy shall <u>not</u> be reduced by the existence of such other insurance.
>
> When both this insurance and other insurance apply <u>on the same basis</u>, whether primary, excess, or contingent, the company shall <u>not</u> be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below. (Emphasis added.)

By contrast, AISLIC's policy included an "escape" clause, which provided:

> Section II - EXCLUSIONS:
> This insurance does not apply to any of the following: . . . 11. Bodily injury, Property Damages, Cleanup Costs, or Claims Expenses <u>covered by any other valid and collectible insurance</u>." (Emphasis added.)

Immediately following the first accident in Comal County, Canal initially reimbursed Travis for the $23,058.54 in pollution clean-up costs Travis incurred in connection with the diesel spill.

---

[1] "'Other insurance clauses' are generally designed by insurers to 'avoid an insured's temptation or fraud of over-insuring . . . property or inflicting self-injury.'" St. Paul Mercury Ins. Co. v. Lexington Ins. Co., 78 F.3d 202, 206 (5th Cir. 1996) (applying Texas law). Such clauses typically fall into one of three categories: (1) "pro rata" clauses, which provide for apportionment of responsibility among insurers, usually either in proportion to their respective policy limits or in equal shares up to the limits of each policy; (2) "excess" clauses, which provide that policy coverage will apply only as excess insurance over any other valid and collectible insurance; and (3) "escape" clauses, which provide that the insurer will have no liability if there is other insurance coverage available to the insured, rendering the policy's coverage "contingent upon the absence of any other coverage." WILLIAM S. MCKENZIE & H. ALSTON JOHNSON, III, 15 LOUISIANA CIVIL LAW TREATISE, INSURANCE LAW & PRACTICE § 228 (2d ed. 1996).

Canal then turned around and demanded $11,529.95 in contribution from AISLIC. At AISLIC, claims supervisor Cheryl Honeycutt consulted with Janet Rittenberry, the AISLIC underwriter for the Supplemental Liability Policy, who informed Honeycutt that the AISLIC policy afforded *primary* coverage for "clean up of oil spills," and that the policy applied in all 50 states. Although Honeycutt was unable to actually obtain a copy of the AISLIC policy to review, she nevertheless caused AISLIC to issue a check to Canal for the entire sum of $11,529.35 in February of 1999. AISLIC had a change of heart regarding its coverage position, however, when later presented with Travis's claims for the Bexar County loss. As it had done for the Comal County loss, Travis submitted its claims for pollution-related clean-up costs to both AISLIC and Canal. This time, a different adjuster for AISLIC, Claims Director D'Ann Gentemann, handled Travis's claims and obtained the AISLIC policy. Upon reviewing the policy, Gentemann concluded that the policy's "escape" clause[2] meant that AISLIC had no liability for claims covered by other policies of insurance. Gentemann also obtained a copy of the Canal policy and determined that its pollution exclusion did not apply to sudden and accidental pollution occurrences such as the Bexar County loss. It was at that time that Gentenmann discovered that AISLIC had paid the Comal County claim in error and concluded that the existence of Canal's coverage at all pertinent times meant that the AISLIC policy afforded only a supplemental layer of coverage to that provided by Canal for either of the two losses. Accordingly, Gentemann issued a formal letter denying coverage for the Bexar County claim, citing the "escape" clause in AISLIC's policy with Travis.

---

[2]We note that AISLIC makes much of the fact that its clause is not an "other insurance" clause, but rather, a policy "exclusion" as denoted by the clause's heading. On the facts of this case, we find that any such distinction is immaterial and thus express no opinion on the merits of this argument.

On November 11, 2000, AISLIC filed a diversity action against Canal in federal district court, seeking a declaration of coverage liability for the 1999 Bexar County loss. AISLIC contended that its policy's escape clause expressly excluded coverage for claims covered by "other insurance" and therefore Canal, as primary carrier, bore sole responsibility up to its policy limits for the loss. Canal answered and counterclaimed that, under Louisiana law, the "other insurance" clauses in the carriers' respective policies were mutually repugnant and thus void in toto, requiring the court to disregard the clauses and pro rate liability for the loss among the insurers. In July of 2001, AISLIC amended its complaint to include an additional claim seeking reimbursement of the sums it paid under the same policy to Canal for the 1998 Comal County loss. AISLIC moved for summary judgment on the coverage liability issue, which the district court granted. Applying Louisiana law, the district court concluded that (1) Canal was primarily liable for the Bexar County loss without contribution from AISLIC prior to exhaustion of Canal's policy limits; and (2) AISLIC had not waived its right to contest coverage for the Bexar County loss by having reimbursed Canal for part of the Comal County loss. AISLIC's reimbursement claim was tried to the bench on September 5, 2002. In its memorandum order of September 17, 2002, the district court denied AISLIC's claim that it was entitled to recoup the sums it paid to Canal in reimbursement for the earlier Comal County loss, citing Louisiana Civil Code article 1949, and entered final judgment in favor of Canal on that claim.

In this appeal, Canal challenges the district court's rulings denying proration of the insurance carriers' respective coverage obligations to Travis for the Bexar County loss and rejecting Canal's assertion that AISLIC had waived its right to contest its responsibility for that loss by having paid the prior similar claim. AISLIC cross-appeals the district court's denial of its right to reimbursement for the Comal County loss.

5

DISCUSSION

I.      Standard of Review

We review the grant of summary judgment de novo, applying the same legal standards as the district court applied to determine whether summary judgment was appropriate. Flock v. Scripto-Tokai Corp., 319 F.3d 231, 236 (5th Cir. 2003)(citing Ramirez v. City of San Antonio, 312 F.3d 178, 181 (5th Cir. 2002)). A district court's determination of state law is also reviewed de novo, Salve Regina College v. Russell, 499 U.S. 225, 231 (1991), as is its interpretation of an insurance policy. Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp., 198 F.3d 548, 550 (5th Cir. 2000). A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

We review a district court's bench trial conclusions of law de novo and its findings of fact for clear error. Kona Tech. Corp. v. S. Pac. Transp. Co., 225 F.3d 595, 601 (5th Cir.2000).

II.     Sources of Law and Methodology: *Special Louisiana* Erie *Considerations*

In a diversity case such as this one, federal courts must apply the choice of law rules in the forum state in which the court sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). The parties agree, and Louisiana choice of law rules dictate, that in this action involving the interpretation of insurance policies issued in Louisiana, Louisiana substantive law governs our decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). To determine state law, federal courts sitting in diversity look to the final decisions of the state's highest court. Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985, 988 (5th Cir. 1992). In the absence of a final decision by

6

the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case. Id. Because the parties dispute just how we should go about making this Erie guess when faced with unsettled questions of Louisiana law, we find it worthwhile to clarify at the outset the guiding principles Louisiana law requires that we adhere to in our decision-making process.

The short answer is that "our ultimate 'Erie guess' requires that we employ the appropriate Louisiana civilian methodology to decide th[e] issue[s presented] the way that we believe the Supreme Court of Louisiana would decide [them]." Lake Charles Diesel, Inc. v. General Motors Corp., 328 F.3d 192, 197 (5th Cir. 2003). Under Louisiana's Civil Code, the only authoritative "sources of law are legislation and custom." LA. CIV. CODE. ANN. art. 1 (2003); Transcon. Gas Pipe Line Corp., 953 F.2d at 988; A.N. YIANNOPOULOS, CIVIL LAW SYSTEM 117 (2d ed. 1999). Thus, in Louisiana, courts must look first and foremost to the state's "primary sources of law: the State's Constitution, codes, and statutes." Prytania Park Hotel, Ltd. v. General Star Indem., 179 F.3d 169, 175 (5th Cir. 1999). As we have previously recognized, "'the primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts.'" Transcon. Gas Pipe Line Corp., 953 F.2d at 988 (quoting Albert Tate, Jr., *Techniques of Judicial Interpretation in Louisiana,* 22 LA. L. REV. 727 (1962))(alteration omitted). Indeed, "[s]tare decisis is foreign to the Civil Law, including Louisiana." Id.; see Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331, 1334 (La.1978). Jurisprudence, even when so cohesive and entrenched as "to rise to the level of *jurisprudence constante*," is merely "a secondary law source." Transcon. Gas Pipe Line Corp., 953 F.2d at 988 (citing Alvin B. Rubin, *Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad*, 48 LA. L. REV. 1369, 1372

7

(1988)). Therefore, while it is true that we will not disregard Louisiana appellate court decisions unless we are convinced "by other persuasive data that the highest court of the state would decide otherwise," "particularly [if] numerous decisions are in accord on a given issue–the so-called jurisprudence constante–[] we are not strictly bound by them." Id.

III.     Priority of Coverage for the Bexar County Loss

With these settled guiding principles in mind, we now turn to the issue of the parties' respective coverage liabilities, if any, to Travis for the Bexar County loss. Canal advances two arguments in support of its contention that the district court erred in ruling that Canal bore sole primary coverage responsibility for the Bexar County loss. Canal asserts first that, under Louisiana case law, "other insurance" clauses such as that contained in the Canal and AISLIC policies are mutually repugnant and must be disregarded, requiring courts to pro rate the loss between co-insurers based upon their respective policy limits. Second, and alternatively, Canal contends that even if the district court correctly determined that AISLIC's policy excluded coverage for the loss to the extent it was covered by Canal's policy, AISLIC's prior payment of the Comal County loss under the same policy waived its right to rely on its policy terms to contest coverage for the Bexar county loss. We address each of these in turn.

A.     The "Other Insurance" Clauses

It is undisputed that Canal's policy afforded primary coverage to Travis for the Bexar County claim, as provided in the Form MCS-90 endorsement attached to its policy. Canal nevertheless argues here, as it did to the district court, that AISLIC must share the cost of the Bexar County loss, contending that the "other insurance" clauses in the Canal and AISLIC policies are irreconcilable. According to Canal, with the decisions of two courts of appeal in Lamastus & Assocs., Inc. v. Gulf

8

Ins. Co., 260 So.2d 83 (La. Ct. App. 4th Cir. 1972), *writ denied*, 262 So.2d 40 (La.1972), and Penton v. Hotho, 601 So. 2d 762 (La. Ct. App. 1st Cir. 1992), Louisiana has adopted a blanket rule that "other insurance" clauses contained in co-insurers' policies are mutually repugnant and thus null, requiring proration of the carriers' coverage responsibilities for their common insured's losses. AISLIC rejects this view, arguing that the authorities cited by Canal are not controlling in the instant matter. Rather, AISLIC avers, the district court correctly found that a plain reading of both policies clearly and explicitly reveals that the Canal policy "provides the [sole] primary coverage for [the Bexar County] claim up to its policy limits," while "AISLIC['s] policy provides no coverage for this claim to the extent that [it] is covered by Canal's policy." In reaching this conclusion, the district court adhered to Louisiana principles of contractual interpretation as articulated by the state's highest court, declining to "change or alter" the clear terms of the two policies "under the guise of interpretation." See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1994); Central La. Elec. Co. v. Westinghouse Elec. Corp., 579 So.2d 981, 985 (La. 1991). We agree with AISLIC and the district court.

### 1. *Application of Louisiana Rules of Contractual Interpretation*

Although there is no Louisiana Civil Code provision or statute specifically directed at the prioritization of coverage responsibilities among co-insurers, the Legislature has directed that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." LA. REV. STAT. ANN. § 22:654 (2003). Under Louisiana law it is clear that an insurance policy is a contract that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil Code. Carbon v. Allstate

9

Ins. Co., 719 So.2d 437, 439 (La. 1998); Louisiana Ins. Guar. Ass'n, 630 So.2d at 763; WILLIAM S. MCKENZIE & H. ALSTON JOHNSON, III, 15 LOUISIANA CIVIL LAW TREATISE, INSURANCE LAW & PRACTICE § 4 (2d ed. 1996). A court's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract. LA. CIV. CODE ANN. art. 2045; Carbon, 719 So.2d at 439; Louisiana Ins. Guar. Ass'n , 630 So.2d at 763. Article 2046 provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Article 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning." See also Peterson v. Schimek, 729 So.2d 1024, 1028-29 (La. 1999); Carbon, 719 So.2d at 440-441. Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract *as a whole*." LA. CIV. CODE ANN. art. 2050 (1987) (emphasis added). Interpreting these Code articles, the Louisiana Supreme Court instructs that "[c]ourts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 580 (La. 2003) (citations omitted). Thus, if "the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." Id. (citations omitted). "The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." Id. (citations omitted).

After carefully reading the AISLIC and Canal policies as a whole and giving their words their generally prevailing meaning, we agree with AISLIC's position that in this case the primary coverage afforded by Canal's policy remains primary and unaffected by the existence of its pro rata clause, and

that AISLIC has no liability for pollution-related damages and claims expenses to the extent they are covered by Canal's policy.    Turning first to Canal's "other insurance" clause, we note a critical dichotomy exists between the clause's two paragraphs which reveals that under the facts presented, Canal's policy contemplates no contribution from AISLIC for Travis's loss. The first paragraph of Canal's "other insurance" clause explicitly provides that the insurance provided by Canal's policy is "primary except when stated to apply in excess of or contingent upon the absence of other insurance." In other words, the policy affords primary insurance unless it elsewhere states that it affords coverage on a different basis.    As noted above, it is undisputed that Canal's policy afforded primary coverage at all times pertinent to this litigation.   The first paragraph then specifies   "When [as here] this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under the policy shall not be reduced by the existence of such other insurance."   By contrast, the second paragraph provides that "[w]hen both [Canal's] insurance and other insurance apply on the same basis, whether primary, excess, or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below."   Thus, the first paragraph, envisioning no contribution from "other insurance," applies when Canal affords primary coverage and the other insurer affords coverage that is on a different basis, whether excess or contingent.   In such a case, Canal alone would be liable for the entirety of the loss up to its policy limits. The second paragraph demands proration of losses among co-insurers only when Canal's policy and that of another insurer afford concurrent levels of coverage, i.e., both primary, both excess, or both contingent. Under those circumstances, Canal and the other insurer would share liability for the loss in proportion to their respective policy limits.

11

The determination of which of the two paragraphs in Canal's "other insurance" clause–different basis/no reduction or same basis/proration–is triggered on the facts presented hinges therefore on the categorization of the level, or layer, of insurance coverage afforded by AISLIC's policy. Though AISLIC has maintained throughout this litigation that its policy is "supplemental," and does not afford the "same level" of insurance as Canal's policy, it has not provided any further explication as to what level of insurance it does indeed afford, focusing its attention instead on defending the enforceability of its own "other insurance" clause. And, despite AISLIC's repeated assertions that its policy is "supplemental" and Canal's own concession that its coverage is primary, Canal simply argued in its briefs and before the district court that AISLIC should have co-primary liability for the Bexar County loss, without addressing AISLIC's contention that the policies do not provide insurance on the same basis. During oral argument, however, Canal stated that the policies do *not* afford coverage on the "same basis," but urged nevertheless that the losses must be prorated, arguing that the "other insurance" clauses were mutually repugnant because, if enforced, Travis would be left with a gap in coverage. According to Canal, the policies do not afford coverage for the "same losses," so they do not "completely overlap." In contrast to AISLIC's policy, Canal avers, the Canal policy does not afford coverage for pollution clean-up costs or claims expenses related to such loss.

We find that Canal's argument is unavailing for two reasons. First, we find that the plain language of Canal's policy belies its assertion that it does not cover the same risk as the AISLIC policy. It is uncontested that the damages at issue in the present case are pollution-related clean-up costs and claims expenses resulting from the sudden and accidental wreck of a Travis diesel transport truck. The insuring clause of AISLIC's policy provides in pertinent part that AISLIC "will pay all sums the Insured legally must pay as loss because of <u>bodily injury, property damage or cleanup costs</u>

12

caused by a Pollution Release from Transported Cargo which is carried by a covered auto" that are "unexpected and unintended from the standpoint of the Insured." The insuring clause of Canal's policy provides in pertinent part:

> [Canal] will pay on behalf of the insured <u>all sums</u> which the insured shall become legally obligated to pay as damages because of <u>bodily injury or property damage</u> to which this insurance applies, caused by an <u>occurrence</u> and arising out of the ownership, maintenance, or use, . . . for the purposes stated as applicable thereto in the declarations of an owned automobile or of a temporary substitute automobile.

(emphasis added).

Although Canal's policy contains a pollution exclusion that excludes coverage for "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, . . . toxic chemicals, liquids or gases, . . . contaminants or pollutants," the exclusion by its own terms "<u>does not apply if such discharge, dispersal, or release is sudden and accidental</u>." It is undisputed that the Bexar County accident, like the Comal County accident, was sudden and accidental. Canal nevertheless contends that its pollution coverage is limited by its insuring clause, which provides coverage for "bodily injury and property damage," and therefore does not extend to clean-up costs or claims expenses. Canal has not directed us to, nor has our close examination of its policy revealed, any such exclusion pertaining to pollution-related clean-up costs or claims expenses. Rather, we find that when Canal's insuring clause and sudden and accidental occurrences provision are construed together, the policy covers "all sums" Travis must pay for bodily injury or property damage arising out of the sudden and accidental discharge of pollutants. Moreover, Canal's policy provides, in its Supplemental Payments provision, that Canal will pay the insured's claims expenses. Therefore, contrary to Canal's assertion, we find that its policy's coverage completely overlaps that

13

of AISLIC's policy with regard to the sudden and accidental pollution-related damages and claims expenses at issue in this case. There is consequently no gap in coverage.

Second, even if we were to agree with Canal's assertion that the two policies did not coextensively cover the same risk, that conclusion still would not suffice to command proration under the plain terms of Canal's "other insurance" clause, which is triggered only if the policies at issue afford insurance for the same risk "on the same basis." "[S]ame basis" is modified by the phrase "whether *primary, excess,* or *contingent*," referring to levels of insurance coverage, not the particular risk covered. We find that close inspection of AISLIC's policy reveals that it may be fairly characterized as affording coverage on a "contingent" basis within the meaning of Canal's policy. AISLIC's policy provides that its coverage "does not apply to 'Bodily injury, Property Damages, Cleanup Costs, or Claims Expenses covered by any other valid and collectible insurance.'" Therefore, the availability of coverage under AISLIC's policy is contingent on the absence of "other valid and collectible insurance." Under the first paragraph of Canal's other insurance clause, then, because Canal affords primary coverage and AISLIC's coverage is on a contingent basis, Canal bears the entirety of the Bexar County loss up to its policy limits. Canal's pro rata clause is never triggered because the policies do not afford coverage on the same basis.

We note that if we were to start our analysis instead with AISLIC's "other insurance clause," we would reach the same result, because the existence of Canal's primary coverage is "other valid and collectible insurance" within the meaning of AISLIC's escape clause that effectively prevents AISLIC's policy from coming into existence. AISLIC's policy, in turn, would thus not constitute the requisite "other insurance" necessary to trigger Canal's pro rata clause. We therefore conclude that, as the words of the policies are clear and our interpretation does not produce any absurd

14

consequences, the AISLIC and Canal policies must be given effect as written without resort to extrinsic evidence. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1994). While we construe the two policies as plainly providing, as the district court concluded, that Canal has primary liability for the Bexar County loss up to its policy limits and that AISLIC's policy does not cover the loss to the extent that it is covered by Canal's policy, we nevertheless address Canal's assertions that Lamastus and Penton are controlling and compel resolution of this appeal in its favor.

## 2. *Louisiana Jurisprudential Treatment of "Other Insurance" Clauses*

Notwithstanding the foregoing, Canal insists, as it did before the district court, that we are Erie-bound to abandon Louisiana's rules of contractual interpretation and follow the holding of an intermediate court of appeal in Lamastus. See 260 So.2d at 86. In Lamastus, the Louisiana Fourth Circuit was asked to allocate the coverage liabilities of two co-insurers whose respective policies contained an escape clause and a type of pro rata clause called an "apportionment clause." Id. at 85-86. In that case it was impossible to discern from the policies' language whether the two insurance carriers were either primary and excess or co-primary insurers. See id. Further, judicial construction of the "other insurance" clauses to make this determination would have required arbitrarily disregarding one insurer's clause in favor of enforcing that of the other to avoid leaving the insured with a gap in coverage. Id. at 85-86. Therefore, the Lamastus court declared the clauses null and prorated the loss among the insurers in proportion to their respective policy limits. Id. at 85-86. In so doing, the Lamastus court quoted with approval the Oregon Supreme Court's decision in Lamb-Weston, Inc. v. Oregon Automobile Insurance Co., 341 P.2d 110 (Or. 1959) on r'hng, 346 P.2d 643:

15

The "other insurance" clauses of all policies are but methods used by insurers to limit their liability, whether using language that relieves them from all liability (usually referred to as an "escape clause") or that used by St. Paul (usually referred to as an "excess clause") or that used by Oregon (usually referred to as a "prorata clause"). In our opinion, whether one policy uses one clause or another, <u>when any come in conflict</u> with the 'other insurance' clause of another insurer, regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto.

260 So.2d at 86 (emphasis added).

Though we hardly think that either <u>Lamastus</u> standing alone or its adoption by the Louisiana First Circuit in <u>Penton</u> approaches the numerosity and unanimity of decisions needed to rise to the level of *jurisprudence constante* that *might* otherwise warrant Canal's insistence that these intermediate appellate court decisions bind our decision in this case, we note that even if they did, these cases do not support the position advanced by Canal. First, neither <u>Lamastus</u> nor <u>Penton</u> can be read as a clear and unequivocal holding, as Canal would have us read them, that the mere existence of other insurance clauses in policies issued by co-insurer militates a finding that the clauses are mutually repugnant and must be disregarded in favor of proration of the respective carriers' liabilities for their common insured's loss. The decisions in both cases were predicated on findings that, *based on the particular language of the policies at hand*, the "other insurance" clauses were irreconcilable.

Significantly, in <u>Lamastus</u>, the policies at issue contained no language such as that contained in the first paragraph of Canal's other insurance clause identifying the coverage as primary (unless otherwise stated) and stipulating that there shall be no reduction in the policymaker's liability for losses covered by "other insurance" that applies on an excess or contingent basis. On the contrary, the apportionment clause considered in <u>Lamastus</u> expressly foreclosed excusing from proration a co-insurer whose policy would afford primary coverage but for the existence of other insurance, providing in pertinent part:

16

[Maryland Casualty] Company shall not be liable for a greater proportion of any loss . . . from any peril . . . covered under this endorsement than (1) the amount of insurance under this policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance, whether collectible or not . . . . .

(emphasis added). Meanwhile, the "escape" clause of the competing insurance policy triggered the above underscored language of the apportionment clause, providing in pertinent part:

[Gulf Insurance] Company shall not be liable for loss if, at the time of loss, there is any other valid and collectible insurance which would attach if this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributing insurance, and then only after all such other insurance has been exhausted.

(emphasis added).

Thus, in contrast to the instant case, in Lamastus, the policy with the escape clause effectively provided for "no primary liability" on the facts presented while the policy with the apportionment clause simultaneously demanded proration of the loss, and therefore limited coverage liability to a co-primary share, notwithstanding the excess or contingent nature of the other insurance. Consequently, enforcement of both "other insurance" clauses would have left the insured with a gap in primary coverage by reducing the liability of the insurer with the apportionment clause to its prorated share without contribution from the insurer with the escape clause.

Similarly, in Penton, the First Circuit Court of Appeal resolved a contest between an excess and a pro rata clause in competing policies by prorating the loss among insurers when enforcement of both clauses would have left the insured with a gap in coverage even though either policy alone, in the absence of the other, would have afforded full primary coverage for the loss. 601 So. 2d 762, 768 (La. Ct. App. 1st Cir. 1992). Like Lamastus, however, Penton cannot be read as a directive to disregard the particular provisions of the insurance policy at hand in favor of a blanket rule that per se invalidates "other insurance" clauses. Indeed, the Penton court stated that it "agree[d] that

17

contracts should be respected as written and that all clauses should be given effect where possible." Id. at 768. Reasoning that an interpretation of the two policies that would leave the insured without coverage for a portion of the loss would "produce an absurdity which neither the insured nor the insurers intended," the Penton court concluded that the excess and pro rata clauses were "mutually repugnant and ineffective," requiring it to "pro rate the loss between the two insurers." Id. at 768-69 (citation omitted).

As demonstrated above, no such conflict or mutual repugnancy exists between the "other insurance" clauses contained in the AISLIC and Canal policies. Rather, in anticipation of the availability of other insurance, Canal's policy (1) identifies itself as primary unless otherwise stated; (2) provides for no sharing of liabilities when its coverage is primary and the other insurance is excess or contingent; and (3) restricts proration to cases in which its coverage and that of other insurance are on the same basis, i.e., both primary, both excess, or both contingent. Enforcement of both "other insurance" clauses points to Canal as primary insurer and AISLIC as secondary insurer, does not result in a gap in coverage, and leads to a result that is expressly contemplated by both insurance policies under the circumstances presented. Quite simply, the mutual repugnancy between "other insurance" clauses that compelled the Lamastus and Penton courts to decline to give effect to both clauses in favor of proration does not exist in this case.

Clutching Erie, Canal nevertheless avers that we are bound by these decisions because no persuasive data exists that the Louisiana Supreme Court would not adopt them as its own to declare the other insurance clauses presented in this case mutually repugnant without regard to the particular language in the policies. According to Canal, the Lamastus Court's endorsement of the Lamb-Weston rule eradicated the distinction between different types of other insurance clauses, whether escape,

18

excess, or pro rata; thus any encounter between "other insurance" clauses in competing policies necessitates a finding of mutual repugnancy and the ratable allocation of the loss among insurers. We disagree.

Even if we were to accept Canal's reading of these cases as articulating such a bright-line, unitary rule, we find that among the "other persuasive data" that supports our interpretation of the two policies are the Louisiana Supreme Court's repeated pronouncements that stress the importance of resolving insurance coverage disputes by analyzing the particular and pertinent policy language presented in each case. See, e.g., Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 583 (La. 2003) (finding that the appellate court erred by concluding that a term in the policy at issue was ambiguous based on a comparison of that policy's language with definitions contained in other policies not before the court; in so doing, "the appellate court ignored the fundamental precept that it was required to interpret the term using its plain, ordinary and generally prevailing meaning *as set forth in the policy at hand*" ) (emphasis added); Central Louisiana Elec. Co. v. Westinghouse Electric Corp., 579 So. 2d 981, 985 (La. 1991) (noting that the court "stress[es] the importance of the particular language contained in the policy in question to the resolution of this dispute"); accord Spiro v. Liberty Mut. Fire Ins. Co., 761 So.2d 53, 56 (La. Ct. App. 4th Cir. 2000) (stating that "[t]he rule of law is that each of these cases must be judged according to the pertinent policy language"). The Louisiana Supreme Court has also cautioned that prior judicial decisions involving the interpretation of policy language that materially differs from the language of the policy under scrutiny are not persuasive authority. See Louisiana Ins. Guar. Ass'n, 630 So.2d at 763 n**.**5 ("Given the uniqueness of the policy language under scrutiny, we reiterate our warning . . . that in interpreting an insurance policy based on prior jurisprudence, the court must carefully compare the language in the policy under scrutiny with that of

19

the policies construed in the prior cases because a difference in verbiage may dictate a difference in outcome.") (citation omitted); Central Louisiana Elec. Co., 579 So.2d at 985 ("Both parties have cited cases from other jurisdictions involving similar factual situations in support of their respective positions; however, because the policy language at issue is unlike the language in those cases, reliance on those cases is misguided.").

We further note that when asked to allocate liability among insurers with competing "other insurance clauses," the Louisiana Supreme Court has distinguished between cases involving competing excess and escape clauses and those involving a conflict between excess and pro rata clauses. Compare Graves v. Traders & Gen. Ins. Co., 214 So. 2d 116, 118 (La. 1968) (excess v. escape) with Juan v. Harris, 279 So.2d 187, 191 (La. 1973) (excess v. pro rata). In the absence of a statutory or public policy prohibition on the limitation of liability in the policy under scrutiny, the supreme court has declined to give effect to both competing clauses only when doing so would create a gap in the insured's primary coverage. See Graves, 214 So. 2d at 118. For example, in Graves, the policy issued by Traders & General Insurance Company provided only excess coverage by virtue of its other insurance clause, while the Traveler's policy provided no coverage insuring "other persons" when any other insurance was available, whether primary or excess, with the consequence that the enforcement of both clauses would have left the insured with no coverage at all. Id. at 117-18. Under those circumstances, the Graves court deemed the clauses mutually repugnant and declined to give effect to either clause, holding the insurers both primary and prorating the loss between them. Id. at 118-19. In reaching its decision, the Louisiana Supreme Court reasoned:

> Our study of the [excess and escape] 'other insurance' clauses quoted from the two policies makes it plain that they cannot be reconciled, and if the provisions of both policies are given effect, neither insurer would be liable. Such a result would render all insurance nugatory and produce an absurdity which neither the insured nor the insurers contemplated.

20

Id.

Contrary to the approach advocated by Canal, in Graves, despite its ultimate determination that the clauses at hand were mutually repugnant, the supreme court did not forego careful scrutiny of the particular policies' provisions in favor of a blanket rule declaring the clauses void in toto. On the contrary, the Graves court adhered to Louisiana's settled principles of contractual interpretation, emphasizing that "[t]he principal consideration in the interpretation of insurance policies is to ascertain the intention of the parties from the language of the contracts. . . . Thus, when words of the contract are clear and explicit and lead to no absurd consequence, the court may not alter them." Id. at 119. Indeed, when close examination of the excess and pro rata "other insurance" clauses at issue in Juan v. Harris revealed that enforcement of both clauses would not result in a gap in coverage, the Louisiana Supreme Court eschewed resort to the equitable rule of proration and instead enforced the clauses as written. 279 So.2d 187, 191 (La. 1973). In Juan, Hartford's excess clause provided in pertinent part that "[w]ith respect to a . . . non-owned vehicle, this insurance shall be excess insurance over any other valid and collectible insurance available to the insured." Id. at 190 n.5. The pro rata clause in the policy issued by Employers required proration of coverage liability when other valid and collectible insurance was available to the insured. Distinguishing Graves, the Juan court stated that "there is no such conflict of insurance clause in the matter before this court. Employers simply has the primary policy on the owned vehicle and Hartford the excess coverage because as to them the truck [involved in the loss] is a non-owned vehicle." Id. at 190. The Juan court expressly rejected Employers' assertions that the excess and pro rata clauses before the court "conflict, and being repugnant, should be disregarded under the rationale of Graves . . . ." Id. at 190-91.

21

As illustrated above, the Louisiana Supreme Court strictly adheres to the contractual interpretation principles set forth in the Louisiana Civil Code when resolving insurance coverage disputes, including those involving varying species of "other insurance" clauses. We therefore cannot countenance Canal's proposition that, to the extent that Lamastus and Penton could be read as articulating a blanket rule invalidating any "other insurance" clauses in competing policies, these decisions are a harbinger of what the Louisiana Supreme Court would decide if presented with the language of the policies under scrutiny in this case. Apart from the factual dissimilarities between those cases and the instant one, we are particularly reluctant to rely on the single holding of Lamastus and its application in Penton "as a foundation for an Erie-guess about how the highest court of the state might rule on a given issue of state law" where, as here, the "the state in question is Louisiana, where the primary source[] of law" is its legislation, and the Louisiana Civil Code spells out, beyond cavil, the proper methodology to employ in interpreting a contract. FDIC v. Abraham, 137 F.3d 264, 268 (5th Cir. 1998). We conclude that neither the Code articles governing contractual interpretation nor their interpretation by the Louisiana Supreme Court leaves any room for the approach advocated by Canal, which ignores the clear legal precept under Louisiana law that courts must consider all language in a policy to determine its meaning and intent. Canal asks that we disregard the policies' plain contractual language and effectively legislate mandatory pro rata clauses from the bench for insurance contracts containing "other insurance" provisions. We find that that request far exceeds any conceivable bounds of our Erie-mandate, and decline the invitation.

        B.       Waiver of the Right to Contest Coverage Liability

22

Canal next contends, in the alternative, that even if AISLIC's "escape" clause excluded coverage for the Bexar County loss, AISLIC has waived the right to rely on the escape clause in its policy to contest coverage liability for the Bexar County loss because it paid the Comal County claim under the same policies "with knowledge of facts clearly showing a claim of non-coverage." Canal asserts that AISLIC underwriter Janet Rittenberry clearly knew the provisions of her own policy and that her expression to Claims Adjuster Honeycutt that the AISLIC policy afforded primary coverage for the Comal County loss, coupled with the payment of that claim, amounts to a waiver.[3]

This contention is without merit. It is true that under Louisiana law, "[w]aiver occurs when there is an existing right, a knowledge of the existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that the right has been relinquished." Steptore v. Masco Constr. Co., 643 So.2d 1213, 1216 (La. 1994). However, Canal has cited no authority that supports its proposition that an insurer's erroneous payment of a claim in contribution to another *insurer* precludes the payor-insurer from later contesting coverage of a similar claim, even if both claims were presented under the same policies. Steptore, the case primarily relied upon by Canal, involved an insurer's assumption of its insured's defense without first obtaining a reservation of rights to contest coverage liability. Id. at 1217. In that case, the Louisiana Supreme Court held that an insurer must reserve its rights vis-à-vis its *insured* to avoid being estopped from raising coverage defenses. Id. The waiver principle articulated in Steptore was intended to protect the insured from conflicts of interest that might arise between the insurer and the

---

[3]AISLIC disputes these factual assertions regarding its claims adjuster's knowledge of the policy's pollution coverage. Though we acknowledge that there is a genuine issue of material fact that would preclude summary judgment, we need not address these arguments because we find that Canal's waiver argument fails as a matter of law.

insured in connection with the defense of the insured. The Louisiana Supreme Court clarified that in the insurance context,

> [w]aiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest.

Id. at 1216 (citations omitted).

We find that the professional responsibility considerations surrounding the attorney-client relationship that warranted the application of waiver principles in Steptore do not arise in cases such as the instant one involving a dispute between two insurers, which involves no insurance triangle of insurer-attorney-insured. We therefore agree with the district court's conclusion that Steptore "is inapplicable to the facts of this case." Moreover, we conclude that the waiver argument advanced by Canal is foreclosed, first, by this court's decision in FDIC v. Duffy, 47 F.3d 146 (5th Cir. 1995), and second by the Louisiana Civil Code's articles governing the "payment of a thing not owed." LA. CIV CODE ANN. arts. 2299-2305 (2003). Applying Louisiana law in Duffy, we determined that an insurer's "[c]onduct in paying one claim under a policy does not prevent the insurer from raising defenses to the policy." Duffy, 47 F.3d at 150 (citing Monju v. Cont'l Cas. Co., 487 So.2d 729, 732 (La. Ct. App. 5th Cir. 1986)). In Duffy, the insurer's non-coverage defense was based on its professional liability policy's provision excluding from coverage any claims arising from prior intentional and dishonest acts. Although the insurer did not raise its non-coverage defense until six years after it became aware that its insured was adjudged dishonest (and thus excluded from coverage) and continued to make payments on the insured's claims throughout that time, we concluded in Duffy that under Louisiana law such conduct does not suffice to waive a non-coverage defense.[4] The panel was

---

[4]While the doctrine of stare decisis is, as we noted above, foreign to Louisiana's Civil Law

(continued...)

24

not persuaded to reach a contrary result by the assertion that the insurer's payment of claims was conduct "inconsistent with its position that the policy is void ab initio." Id.

We also find that Louisiana's Code articles governing the "payment of a thing not owed" compel our conclusion that, contrary to Canal's argument, an insurer does not, by virtue of making a payment on a claim, waive the right to assert coverage defenses to a subsequent claim. See LA. CIV CODE ANN. arts. 2299-2305 (2003). Indeed, Louisiana's intermediate appellate courts have relied on these articles in holding that an insurer's erroneous, or even negligent, payment of a claim to its insured does not bar the insurer from later recouping the amount paid. Dear v. Blue Cross of Louisiana, 511 So.2d 73, 74-76 (La. Ct. App. 3d Cir. 1987) (holding that an insurer's erroneous payment to its insured for medical expenses arising from a preexisting condition that was excluded from coverage did not bar the insurer from recovering the amounts paid); Central Sur. & Ins. Corp. v. Corbello, 74 So.2d 341, 344 (La. Ct. App. 1st Cir.1954) (allowing insurer to recover payments it made to its insured for costs related to an accident that occurred after the expiration of the policy); see also Pioneer Bank & Trust Co. v. Dean's Copy Prods., Inc., 441 So. 2d 1234, 1236-37 (La. Ct. App. 2d Cir. 1983) (holding that a bank's negligence in mistakenly paying a judgment creditor who

---

[4](...continued)
regime, *we* nevertheless "are, of course, a strict stare decisis court." FDIC v. Abraham, 137 F.3d 264, 268 (5th Cir. 1998). As we have repeatedly stated,

> [o]ne aspect of that doctrine that we adhere to without exception is that one panel of this court cannot disregard, much less overrule, the decision of a prior panel. Adherence to this rule is no less immutable when the matter determined by the prior panel is the interpretation of state law. . . .

Id. (footnotes and citations omitted). Accordingly, in the absence of "'a subsequent state court decision or statutory amendment which makes this Court's [prior] decision clearly wrong,'" we are bound by a prior panel's interpretation of state law "'without regard to any alleged existing confusion in [that] state['s] law.'" Id. at 269 (quoting Broussard v. Southern Pac. Transp. Co., 665 F.2d 1387, 1389 (5th Cir. 1982) (en banc)).

25

had no account with the bank did not bar the bank's claim for reimbursement of the amount of debt paid).[5] Moreover, under Louisiana Civil Code article 2299, analyzed in detail below, even "a person who knowingly . . . has paid . . . a thing not owed may reclaim" the amount paid from the recipient. LA. CIV. CODE. ANN. art. 2299 cmt. (d) (2003).[6] Applied to the facts before us, even if AISLIC's payment to Canal for the Comal County loss were made knowingly, such knowing payment would not waive its right to reclaim that amount. We therefore are unpersuaded by Canal's assertion that AISLIC's payment of the Comal County claim can waive the right to contest the subsequent Bexar County claim, when under Louisiana law such payment would not even estop the payor, AISLIC, from reclaiming the amounts paid for the Comal County loss. In sum, we decline to extend application of the waiver rule articulated in Steptore to the relationship among insurers particularly when, under the facts presented, such application would contravene the Louisiana Civil Code and this Circuit's precedent. Therefore, like the district court, we reject the contention that AISLIC waived the right to rely on its "other insurance" clause to contest liability for the Bexar County loss by having paid the prior Comal County claim.

---

[5]In Central Surety & Insurance Corp. v. Corbello, the First Circuit Court of Appeal reasoned:

> [the insurer's] payment here was made through error and we fail to see how the question of negligence on the [insurer's] part in making payment should control [its] right of recovery. The defendant[-insured] has admittedly received a large sum of money which, as we have found, was not due him. There is nothing in the record which would tend to show that he was injured or damaged, in any way as the result of receiving the money. Under these circumstances we do not think he should be allowed to capitalize upon and be enriched by the error made by the plaintiff[-insurer].

74 So.2d 341, 344 (La. Ct. App. 1st Cir.1954).

[6]A "person" may be natural or juridical. "A juridical person is an entity to which the law ascribes personality, such as a corporation or a partnership." LA. CIV. CODE ANN. art. 24 (2003).

26

IV.     Right to Reimbursement–Article 2299 Payment of a Thing Not Owed

AISLIC asserts in its cross-appeal, as it did before the district court, that it is entitled to reclaim the amounts it erroneously paid to Canal for the Comal County loss. AISLIC advances two arguments in support of this proposition. First, citing Louisiana Civil Code article 1949, AISLIC argues that the district court erred by finding that its payment of the Comal County claim with full knowledge of the surrounding facts precluded it from reimbursement under article 1949. According to AISLIC, Cheryl Honeycutt paid the claim on behalf of AISLIC based on a mistaken understanding of the scope of the AISLIC policy. AISLIC further avers that the district court erred by failing to consider its argument that Louisiana Civil Code article 2302 entitles it to reclaim the sums paid as "a person who paid through mistake believing himself a debtor."

We find that neither article 1949 nor article 2302 applies in this case. However, because we conclude that article 2299 does indeed apply and allows AISLIC to reclaim the sums paid to Canal for the Comal County claim, we reverse the district court's judgment regarding the reimbursement issue.

Erie-bound, we begin our analysis with the Louisiana Civil Code. Under Louisiana law, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law is applied as written, and no further interpretation may be made in search of legislative intent. See LA. CIV.CODE ANN. art. 9 (2003); In re Louisiana Health Serv. and Indem. Co., 749 So.2d 610, 615-16 (La. 1999). "However, when the language of a [law] is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law

27

as a whole." In re Louisiana Health Serv. and Indem. Co., 749 So.2d at 615-16 (citing LA. CIV. CODE ANN. arts. 10, 12)).

Article 1949 provides that "[e]rror vitiates consent only when it concerns a cause without which an obligation would not have been incurred and that cause was known or should have been known to the other party." This article has no application in the instant case, as its applicability presumes the existence of a contract with regard to which, because of a defect in formation, the law excuses the aggrieved party from performance. Here, while Canal and AISLIC are each in privity with Travis, they are not in privity with each other; rather, they are strangers with no contractual obligation (termed "conventional obligation" in the Code). AISLIC neither paid Canal for the Comal County loss pursuant to any contractual obligation to Canal, nor did such contribution create a contractual obligation between the insurers. As there was no contract to be vitiated by a vice of consent, this article provides no recourse to AISLIC against Canal for a payment made in error. Article 2302 is equally inapplicable in this matter, because that provision applies only to three-party situations in which one party, A, mistakenly pays a debt on behalf of B, a debtor, to C, the obligee, where A believes he or she (rather than B) is the debtor.[7] In such circumstances, A may recover the erroneous payment either from C, the obligee and recipient of the payment, or, to the extent that C "has disposed

---

[7]Article 2302 , "Payment of the Debt of Another Person," provides:

> A person who has paid the debt of another person in the erroneous belief that he was himself the obligor may reclaim the payment from the obligee. The payment may not be reclaimed to the extent that the obligee, because of the payment, disposed of the instrument or released the securities relating to the claim. In such a case, the person who made the payment has recourse against the true obligor.

LA. CIV. CODE. ANN. art. 2302 (2003).

28

of the instrument or released the securities relating to the claim" because of the payment, A has recourse against B, the "true debtor," to reclaim the sums paid in error.

In this case, however, AISLIC has not mistakenly paid the debt of another person. Rather, on the facts presented, we have a two-party situation in which AISLIC "made a payment for the discharge of an obligation which did not then exist." See Dauphin v. Lafayette Ins. Co., 817 So.2d 144 (La. Ct. App. 3d Cir. 2002) (citing LA. CIV. CODE ANN. art. 2299). "A thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist." LA. CIV. CODE ANN. art. 2300. It is uncontested that AISLIC paid Canal for part of the Comal County loss. As we have determined that the district court correctly concluded that AISLIC's policy provided no coverage to the extent Travis's claims were covered by Canal's policy, AISLIC's payment in contribution to Canal was a payment of a thing not owed. Under Louisiana Civil Code article 2299, "[a] person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." In stark contrast to articles 1949 or 2302, the right to reimbursement conferred by article 2299 exists regardless of whether such payment was made knowingly or through error. LA. CIV. CODE. ANN. art. 2299, cmt. b. (2003) ("[A] person who knowingly or through error has paid or delivered a thing not owed may reclaim it from the person who received it."). Because we find that the text is clear and unambiguous and that its application in the instant case does not lead to absurd consequences, but rather merely restores the status quo to what the parties' agreements contemplated, we conclude that AISLIC is entitled to reimbursement of the amount it paid Canal for the Comal County claim, without regard to whether such payment was made knowingly.

We further conclude that this result comports with and is buttressed by the Louisiana Supreme Court's most recent pronouncement on article 2299 in Gootee Construction, Inc. v. Amwest Surety

29

Insurance Co., 856 So.2d 1203, 1206-07 (La. 2003). In Gootee, the supreme court held, as a matter of first impression, that a party is entitled to reimbursement of sums paid to satisfy an adverse summary judgment ruling upon subsequent reversal of that ruling. Applying article 2299, the Louisiana Supreme Court reasoned that the effect of the reversal was that the basis for the payment ceased to exist; thus the recipient "ha[d] no legal right to retain the funds." Gootee, 856 So.2d at 1207. In so doing, the supreme court permitted the recovery of a debt that, while "owed" at the moment of payment, later became "not due." Id. In our view, the facts in the instant case weigh even more strongly in favor of allowing relief under article 2299 because, in contrast to Gootee, in this case Canal was neither legally entitled to retain the funds at the time AISLIC paid the claim nor at any time thereafter. We therefore find that, if presented with the facts in the instant case, the Louisiana Supreme Court would agree with our interpretation of article 2299 and likewise conclude that Canal is bound to return the funds paid by AISLIC for the prior Comal County loss.

CONCLUSION

We are persuaded that the Louisiana Supreme Court, if presented with the particular facts of this case, would adhere to the Civil Code's rules of contractual interpretation and forego adopting a per se rule of apportionment and instead, as we have done, enforce the policies as written. We do not, however, venture an Erie guess as to how the Louisiana's highest state court might resolve coverage prioritization issues between competing pro rata and escape clauses in other contexts. We hold only that, under the circumstances presented, when a policy on its face affords primary coverage and expressly excludes proration of liability when "other insurance" is excess or contingent and the competing policy, containing an escape clause, affords coverage either as excess or contingent on the absence of other insurance, the insurer with the pro rata clause bears sole and primary liability for the

30

loss while the insurer with the escape clause is not liable to the extent that the other insurer's policy covers the loss. For the foregoing reasons, we affirm the district court's summary judgment rulings regarding allocation of liability and waiver, reverse the district court's judgment denying AISLIC's right to reimbursement, and render judgment in favor of AISLIC.

AFFIRMED in part, REVERSED in part, and RENDERED.