MAX N. TOBIAS, JR., Judge.
|, The plaintiffs, Joseph Barreca and the Succession of Lynette S. Barreca (collectively, “Barreeas”), appeal an adverse judgment rendered against them dismissing their breach of contract claims against the defendant, New York Life Insurance Company (“New York Life”). The district court granted summary judgment in favor of New York Life, finding that the Barre-cas’ claims had prescribed. Based upon our de novo review of the record, we affirm the dismissal of the Barreeas’ claims, finding that no breach of the insurance contract occurred on the part of New York Life and, accordingly, pretermit a discussion of the assigned errors relating to the issue of prescription.
In 1964, New York Life issued a life insurance policy insuring the life of Joseph Barreca. His wife, Lynette Barre-ca, now deceased, was the beneficiary. In 1988, the policy was surrendered and its cash value of $20,801 was used to fund a new New York Life life insurance policy (“the policy”) to Mrs. Barreca, as the owner, beneficiary, and spouse of the insured, Mr. Barreca. The Barreeas describe the policy as a single-premium policy with a term of twenty years until the insured, Mr. Barreca, an attorney, reached the age of eighty. The Barreeas further posit that in the event of the death of Mr. Barreca, the policy was to pay death benefits to the | beneficiary; if, however, the insured lived through the twenty-year term of the poli *483 cy, which he did, the plaintiffs aver he was entitled to the cash value and dividends pursuant to the policy. According to the Barrecas, the twenty-year policy term ended on 8 September 2007 without the death of the insured and though a claim for payment was made by Mr. Barreca, New York Life refused to pay the cash value of the policy.[1]
In March 2008, the Barrecas instituted the instant suit against New York Life and their agent, Matthew D. Weiser, asserting claims for breach of contract, breach of implied good faith and fair dealing, breach of fiduciary duty, violation of Louisiana’s Unfair Trade Practices Act, and fraud. New York Life moved for summary judgment, which the trial court granted, finding that the Barrecas’ claims against New York Life had prescribed. The Barrecas timely filed the instant appeal.
While the Barrecas raise on appeal three alleged errors committed by the trial court, asserting that the trial court erred in concluding that their breach of contract claims have prescribed, based upon our de novo review of the policy at issue, we do not reach the issue of prescription because we do not find that New [sYork Life committed any breach of the contract’s terms.[2] This entire case centers upon whether the 1988 policy issued by New York Life was a whole life policy having an annual premium that lapsed due to nonpayment of pre *484 miums or whether the policy was a single-premium whole life policy that would have a cash surrender value of $80,000 on its twentieth anniversary and which would begin to decrease in value below $80,000 after twenty years from its inception.
In support of their contention that the policy was a single-premium policy, the Barrecas aver that the insurance agent, Mr. Weiser, who convinced the Barrecas to enter into the transaction surrendering one insurance policy for its cash value to purchase a new one, verbally advised them that the policy would necessitate their making a single payment of a $20,801 premium and that no other premium payments would ever be required. The Bar-recas further direct the court to a letter written by Mr. Weiser referencing the “single premium” of $20,801. According to the Barrecas, the verbal and written representations by Mr. Weiser confirm the contents of the policy, which they contend repeatedly refers to a “single premium policy.”
|4Conversely, New York Life avers that the Barrecas were sold a whole life policy, requiring payment of annual premiums of $3,642.00. This is evidenced by the policy itself, which the Barrecas were to read upon receipt. Further, New York Life maintains that its communications with the Barrecas through the years put them on notice that additional premiums were due annually throughout the life of the policy. New York Life sent annual notices listing the amount of dividends associated with the policy for the year, the amount of the dividend to be applied to the payment of the annual premium, and the outstanding amount, if any, of the annual premium.
In addition to these regular updates, New York Life communicated with Mrs. Barreca in writing about policy-related information regarding payment of policy premiums. By letter dated 7 August 1998, New York Life reminded her that while she had elected to pay premiums through the “Premium Offset Plan,” which paid premiums from the policy’s dividends, the policy no longer had sufficient dividend values; thus, the Premium Offset Plan would be discontinued and out-of-pocket payments for the premiums were required.
By letter dated 4 October 1999, New York Life advised that the $3,642 premium due on 3 September 1999 was overdue and under the policy’s “Automatic Premium Loan” provision, the premium would be paid using the loan provision against the policy’s cash surrender value unless payment was received within 30 days. New York Life then sent a letter dated 9 November 1999, alerting the Barrecas that a loan in the amount of $3,642 had been made against the policy to pay the yearly premium. The same scenario arose in 2000, whereby the premium was paid through a loan made against the policy. The letter of 8 [ ^November 2000 also noted that by the terms of the policy, the next premium due in 2001 could not be paid by the Automatic Premium Loan.
The Barrecas were advised by letter dated 4 October 2001, that the policy had lapsed due to nonpayment of the premium due 3 September 2001. However, New York Life stated that the policy could be reinstated by either sending the past due premium or by participating in the “Default Premium Payment Option” by 3 November 2001. Finally, by letter dated 7 December 2001, New York Life advised that the policy had lapsed due to nonpayment of premiums. The Barrecas have not disputed receipt of the correspondence and notices from New York Life.
The Barrecas have alleged that in April 1988, their agent, Mr. Weiser, induced them to purchase the policy in question by misrepresenting that the poli *485 cy would require the payment of a single premium. According to the Barrecas, Mr. Weiser merely facilitated the underlying transaction of the sale of the policy by New York Life.[3] The Barrecas contend New York Life breached the contract between them by failing to comply with the terms of its own contract. In support of this argument, the Barrecas rely on certain policy language, and a letter they received from Mr. Weiser soon after the policy was purchased that refers to the payment of a “single premium,” which was to come from the cash value of their preexisting policy, to purchase the new policy.
The following policy provisions are pertinent to this appeal:
| fiPage one of the policy provides:
10 Day Right To Examine Policy. Please examine your policy. Within 10 days after delivery, you can return it to New York Life Insurance Company or to the agent through whom it was purchased, with a written request for a full refund or premium. Upon such request, the policy will be void from the start, and a full premium refund will be made.
Premiums. The premiums for this policy are shown in the Premium Schedule on the Policy Data page. They are payable in accordance with the Premiums section.
Whole Life Policy.
Life Insurance Proceeds Payable at Insured’s Death.
Premiums Payable During Insured’s Lifetime,
as shown on the Policy Data page.
Policy is Eligible for Dividends. [Emphasis in original.]
Page two of the policy provides:
POLICY DATE — September 8,1987
DATE OF ISSUE — May 18,1988
OWNER — LYNETTE S. BARRECA, SPOUSE OF INSURED
PLAN Whole Life
AMOUNT FACE AMOUNT $80,000
PREMIUM SCHEDULE
PREMIUMS PAYABLE AT ANNUAL INTERVALS AS FOLLOWS (Premium includes the following amounts for any supplementary benefits)
BEGINNING AS OF
MO. DAY YEAR PREMIUM
9- 3- 1987 $3,642.00 PAYABLE FOR
REMAINDER OF INSURED’S LIFE.**
[[Image here]]
«’PREMIUM PAYING PERIOD MAY BE SHORTENED BY USING DIVIDEND VALUES TO MAKE POLICY FULLY PAID-UP. [Emphasis supplied.]
_[¿Page Two A of the policy is the Policy Data page, which includes the following table:
*486 [[Image here]]
Page five of the policy states, in pertinent part:
Payment of Premiums Each premium is payable while the Insured is *487 living, or on or before its due date as shown in the Premium Schedule on the Policy Data page. Premiums are payable at our Home Office or one of the service offices.
The premiums for this policy can be paid at intervals of 3 months or 6 months, or once each year. The method we use to determine the premium rate for each of these intervals is the method that was in effect as of the policy date shown on the Policy Data page. The interval can be changed by paying the correct premium for the new interval. Premiums can be paid by any other method we make available.
Grace Period We allow 31 days from the due date for payment of a premium. All insurance coverage continues during this grace period.
Nonpayment of Premium If a premium is not paid by the end of the grace period, this policy will lapse. All insurance will end at the time of lapse, if the policy has no cash value and no dividend values. If the policy has cash value or dividend values, insurance can be continued only as stated in Options 1 or 2 of the Options Upon Lapse provision, but any insurance or benefits from riders or dividends will end at the time of lapse.
Options Upon Lapse If the policy has cash value or dividend values at the time of lapse, it will continue as extended insurance, if available. It may happen that the amount of extended insurance would be less than or equal to the amount of paid-up insurance available, or the Table of Guaranteed Values on the Policy Data page | ;,shows that extended coverage is not available. In these cases, the policy will continue under the paid-up insurance option instead.
Instead of extended insurance, paid-up insurance can be elected or you can surrender the policy for cash. The paid-up insurance option can be elected on the application or in your signed notice. We must receive this notice no later than 3 months after the due date of the overdue premium.
1. Extended Insurance Extended insurance is level term insurance for which no more premiums are due. It is payable to the beneficiary when we have proof that the Insured died after the end of the grace period and before the end of the term period. The amount of extended insurance will equal the face amount of this policy, plus the amount of any paid-up additions and dividend accumulations, less any unpaid loan. No insurance or benefits from riders or dividends will be provided after the end of the grace period.
We calculate the end of the term period as of the due date of the overdue premium. We do this by applying the sum of the cash value and dividend values, less any unpaid loan, at the net single premium rate for term insurance for the insured’s age on that date. The term period is measured from that due date.
This insurance can be surrendered at any time for its cash value, but it has no loan value and is not eligible for dividends. All insurance will end when you send us your signed request for the cash value proceeds.
2. Paid-up Insurance Paid-up life insurance begins as of the date we record your notice electing it, or begins at the end of the grace period if later. No more premiums are due for this insurance. It is payable to the beneficiary when we have proof that *488 the Insured died while this paid-up insurance option was in effect.
|inWe calculate the amount of paid-up insurance as of the due date of the overdue premium. We do this by applying the sum of the cash value and dividend values, less any unpaid loan, at the net single premium rate for the insured’s age on that date. In most cases, this amount will be less than the face amount of this policy. No insurance or benefit from riders will be provided after this paid-up insurance option goes into effect.
This insurance can be surrendered at any time. It has cash value and loan value, and is eligible for dividends. All insurance will end when you send us your signed request for the cash value proceeds.
3. Surrender for Cash Instead of extended insurance or paid-up insurance, you can surrender this policy for its cash value and dividend values, less any unpaid loan, as stated in the Cash Value provision. All insurance will end when you send us your signed request for cash value proceeds.
Page six of the policy states, in pertinent part:
Premium Adjustment at Death We will increase the life insurance proceeds by any part of a premium paid for the period after the policy month in which the Insured dies.
If the Insured dies during a grace period, we will reduce the proceeds by an amount equal to the premium for one policy month.
CASH VALUES AND LOANS
Cash Value Cash values for this policy at the end of selected policy years are as shown in the Table of Guaranteed Values on the Policy Data page, if premiums have been paid as called for in the Premiums section. These values do not include dividend values, and they do not reflect any unpaid loan. Cash values at other times depend on the date to which premiums have been paid, and on how much time has passed since the last , policy anniversary. When you ask us, we will tell you how much cash value there is.
|nAt any time after the policy has cash value or dividend values, you can surrender it for the sum of these values, less any unpaid loan. All insurance will end when you send us your signed request for these surrender proceeds. [Emphasis supplied.]
Page seven of the policy states, in pertinent part:
Automatic Premium Loan (APL) If elected, APL provides an automatic loan which pays an overdue premium at the end of the grace period, subject to two conditions. First, the loan value must be enough to pay that premium. Second, if premiums have been paid by APL for 2 years in a row, the next premium will not be paid by APL. After a premium is paid other than by APL, before the end of the grace period, premiums can again be paid by APL.
APL can be elected in the application. You can also elect APY in your signed notice which we must receive before the end of the grace period. You can cancel this election for future premiums by telling us in your signed notice. [Emphasis supplied.]
Loan Repayment All or part of an unpaid loan and accrued interest can be repaid before the Insured’s death or before you surrender the policy. We will deduct any unpaid loan when policy proceeds are payable.
*489 It the policy is being continued as extended or paid-up insurance, any loan which we deducted in determining that insurance may be repaid only if the policy is reinstated. If that loan is not repaid, we will not deduct it again when policy proceeds are payable.
112When Unpaid Loan Exceeds Loan Value In a given policy year it may happen that, based on the loan interest rate in effect when that year began (ignoring any higher interest rate during that year), an unpaid loan and accrued interest will exceed the sum of the cash value and any dividend values. In this case, we will mail a notice to you at your last known address and a copy to any assignee on our records. All insurance will end 31 days after the date on which we mail that notice, if the excess of the unpaid loan and accrued interest over the sum of the cash value and any dividend values is not paid within that 31 days.
Page eight of the policy states, in pertinent part:
Annual Dividend While this policy is in force, except as extended insurance, it is eligible to share in our dividend surplus. Each year we determine the policy’s share, if any. This share is payable as a dividend on the policy anniversary, if all premiums due before then have been paid. We do not expect a dividend to be payable before the second anniversary. [Emphasis supplied.]
Dividend Options Each dividend can be applied under one of the 4 options listed below. An option can be elected in the application. You can also elect or change the option for future dividends if you tell us in your signed notice.
1. Paid-up Addition Applied to provide paid-up life insurance at the net single premium rate for the insured’s age at that time. No more premiums are due for this insurance. It has cash value and is eligible for dividends. Before the Insured’s death, you can surrender paid-up additions for their cash value that has not been borrowed against. The amount of this insurance in force at the Insured’s death will be part of the life insurance proceeds.
| ia2. Dividend Accumulation Left with us to accumulate at interest. On each policy anniversary, we credit interest at the rate we set each year. This rate will be at least 3.5% per year. Before the Insured’s death, you can withdraw accumulations that have not been borrowed against, with interest to the date of withdrawal. Any accumulations which we still have at the Insured’s death will be part of the life insurance proceeds.
3. Premium Payment Applied toward payment of premium, provided any balance of that premium is also paid when due. Any part of the dividend not needed to pay the premium will be used to pay any loan interest due, unless you have asked to have that part paid in cash. Any part of the dividend not used to pay a premium or loan interest will be paid in cash.
4. Cash Paid in cash.
Fully Paid-up Policy You may shorten the premium paying period for this policy by having it made fully paid-up with no more premiums due. This may be done on any premium due date, if the sum of the cash value and dividend values equals the total single premium for the policy and any riders, based on the Insured’s age on *490 that date. We must receive your signed notice within 31 days of that date.[4]
Page eleven of the policy states, in pertinent part:
GENERAL PROVISIONS
Entire Contract The entire contract consists of this policy, any attached riders or endorsements and the attached copy of the application. Only our Chairman, President, Secretary, or one of our Vice Presidents can change the contract, and then only in writing. No change will be made in the contract without your consent. No agent is authorized to change this contract. [Emphasis supplied.]
| ^Application In issuing this policy, we have relied on the statements made in the application. All such statements are deemed to be representations and not warranties. We assume these statements are true and complete to the best of the knowledge and belief of those who made them. No statement made in connection with the application will be used by us to void the policy or to deny a claim unless that statement is a material misrepresentation and is part of the application.
The policy also contains a rider, which, in pertinent part, provides the following:
RIDER
OPTION TO PURCHASE PAID-UP ADDITIONS (OPP)
Benefit This rider provides the Owner with the right to purchase new paid-up life insurance on the Insured. The purchase may be made as of the policy date, but no later than 6 months after that date; and as of each policy anniversary, but no later than 31 days after that anniversary.
No insurance may be purchased under this rider after it ends, or while it is not in effect, or while premiums for the policy are being waived on account of total disability.
Any paid-up life insurance purchased under this rider is a paid-up addition, and is subject to the Paid-up Additions provision in the Dividends section of the policy.
What Insurance May be Purchased Each amount of new paid-up insurance which may be purchased is based on the single premium rate for the Insured’s age on the date the purchase takes effect. The amount of the single premium paid each year to purchase the new insurance is in addition to the premium payable for the policy. Unless the Company agrees otherwise, this single premium can not be less than 10% nor more than 100% of the annual premium amount for the basic plan of insurance (excluding premiums for any riders and excluding the policy constant), based on the standard class of risk.... In no event can the single premium which is paid be less than $100.
| ,sWe first note that despite what the agent may have told the Barrecas, the application for the policy at issue, which is made a part of and attached to the policy, clearly states that Mr. Barreca was apply *491 ing for a “whole life nonsmoker age 60” plan on his life. He elected to pay annual premiums for the policy. He also specifically elected the “Automatic Premium Loan (APL)” option, the “Paid-up Addition” dividend option, and the “Option to Purchase Paid-up Additions (OPP)” rider, each of which refer to payment of annual premiums. The application was signed by Mr. Barreca as the insured. It is well-settled that a party who signs a written instrument is presumed to know its contents. Coleman v. Jim Walter Homes, Inc., 08-1221, p. 7 (La.3/17/09), 6 So.3d 179, 183; Aguillard v. Auction Management Corp., 04-2804 (La.6/29/05), 908 So.2d 1, citing Tweedel v. Brasseaux, 433 So.2d 133, 137 (La.1983); Dufrene v. HBOS Mfg., LP, 03-2201 (La.App. 4 Cir. 4/7/04), 872 So.2d 1206.
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts. La. C.C. art. 1983; Smith v. Matthews, 611 So.2d 1377 (La.1993); Dean v. State Farm Mut. Automotive Ins. Co., 07-645 (La.App. 4 Cir. 1/16/08), 975 So.2d 126. If the language in a policy is clear, unambiguous, and expressive of the intent of the parties, the policy must be enforced as written. La. C.C. arts. 1901, 1945-1946; Central Louisiana Elec. Co. v. Westinghouse Elec. Corp., Inc., 579 So.2d 981, 985 (La.1991); LeBlanc v. Davis, 254 La. 439, 444, 223 So.2d 862, 863 (1969). To ascertain the common intent of the parties, one must look to the language of the insurance policy. See Peterson v. Schimek, 98-1712, p. 3 (La.3/2/99), 729 So.2d 1024, 1028. The meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or | ^contradicted by parol evidence. La. C.C. art. 1848; Highlands Underwriters Ins. Co. v. Foley, 96-1018, p. 6 (La.App. 1 Cir. 3/27/97), 691 So.2d 1336, 1340. Conversely, the use of extrinsic evidence is proper, where an insurance contract is found to be ambiguous after examination of the four corners of the instrument. Highlands, 96-1018, p. 7, 691 So.2d at 1340. Thus, where uncertainty exists as to the terms of a written contract, because its provisions are susceptible to more than one interpretation or when the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or show the intention of the parties. Id., citing La. C.C. art. 2045.
When the language of an insurance policy is clear, courts must enforce the contract as written and may make no further interpretation in search of the parties’ intent. Id.; Adams v. Unione Mediterranea Di Sicurta, 220 F.3d 659, 663 (5th Cir.2000). When policy provisions are ambiguous, they are generally construed against the insurer in favor of coverage. La. C.C. art. 2056; La. Ins. Guar. Ass’n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 764.
Words in an insurance contract are to be given their generally prevailing and ordinary meaning, unless they have acquired a technical meaning. La. C.C. art. 2047; Peterson, 98-1712, p. 5, 729 So.2d at 1028-29. In addition, an insurance contract is construed as a whole and each provision in the policy must be interpreted in light of the other provisions so that each is given meaning. Id. In other words, one portion of the policy should not be construed separately at the expense of disregarding other provisions. Id., citing La. C.C. art. 2050.
Our de novo review of the policy, which includes Mr. Barreca’s signed application for insurance, unequivocally establishes for us that New York Life issued the policy exactly in accordance with the specific op *492 tions requested by Mr. [17Barreca in the application: a whole life policy with annual premiums. Accordingly, we find no breach of the contract of insurance by New York Life. The policy clearly states on its face that it is a whole life policy requiring the payment of annual premiums, not a “single premium policy.”[5] The Barrecas had a duty to review the policy, which specifically provided for a “10-Day Right To Examine Policy” from its delivery and if it did not comport with their understanding or desires, they were to contact New York Life or them agent for clarification or a full refund of premium. Apparently, they did not do so. Because the policy is unambiguous, however, we cannot consider any evidence outside the four corners of the contract.
Accordingly, based on the foregoing, we affirm the trial court’s judgment dismissing the Barrecas’ breach of contract claims against New York Life.

AFFIRMED.

McKAY, J., Dissents.

. Pretermitting for the present whether or not the policy was a whole life policy requiring the payment of annual premiums or a single-premium whole life policy, in either case, a whole life policy, by its very nature, does not bear a “term” as suggested by the Barrecas. A whole life policy would continue to remain in force building cash value provided the premiums were paid. If the whole life contract of insurance was intended to have a certain value on its twentieth anniversary, then certain assumptions come into play, to-wit: all premiums were paid when due and/or accrued dividends were applied to reduce premiums or to buy paid up additional insurance, and/or cash value remained to pay unpaid premiums due by means of a loan against the policy; after twenty years the cash value/death benefit would begin to decrease from the value it was supposed to have on its twentieth anniversary. Throughout the "life” of a whole life policy, it may be surrendered for its cash surrender value, if any, at any time.
Contrary to the Barrecas’ contention, Mrs. Barreca or her succession is the owner of the policy. The insured, Mr. Barreca, is neither the owner nor beneficiary, who would be entitled to any cash value and/or dividends. Thus, Mr. Barreca was never personally entitled to any cash value or dividends pursuant to the policy unless he was the sole heir and legatee of Mrs. Barreca's succession.

. In their assignments of error, the Barrecas contend the “term of the life insurance policy ... did not end until September 3, 2007 and that is the earliest date when prescription [on their cpntract claims against New York Life] could have commenced to run.” They also aver that the trial court erred by granting summary judgment on the-application of La. R.S. 9:5606 to the claims against New York Life, as that statute only applies to any actions the Barrecas may have had against the insurance agent, Mr. Weiser, which claims are not before us. Because we find no independent breach by New York Life of the provisions of the contract of insurance at issue herein when it issued the policy to the Barrecas in 1988, we do not reach the issue of prescription". However, we do note that La. R.S. 9:5606 only applies to the agent, not the insurer.
Further, New York Life argues res judicata applies in this case based upon the settlement in a nationwide class action suit against it. See Willson v. New York Life Ins. Co., Index No. 127804/94 (Sup.Ct.N.Y.County), affirmed, No. 58379 & M2103-M2340 & M2356, 228 A.D.2d 368, 644 N.Y.S.2d 617 (N.Y.App.Div.1996). New York Life did not answer the appeal, and thus cannot raise an assignment of error. See La. C.C.P. art. 2133. However, an exception of res judicata can be noticed by this court on its own motion. La. C.C.P. art. 927 B. Because we have elected to decide this case on other grounds, we do not reach the issue of whether res judicata applies in this case.

. Under Louisiana law, an insurance broker or agent owes a fiduciary duty to his customers, which includes a duty to prudently advise one’s clients regarding recommended coverage. See Taylor v. Sider, 99-2521 (La.App. 4 Cir. 5/31/00), 765 So.2d 416; Durham v. McFarland, Gay and Clay, Inc., 527 So.2d 403 (La.App. 4 Cir. 1988). The duty imposed upon insurance agents, like that imposed on attorneys, physicians, and accountants, is that of "reasonable diligence,” a breach of which gives rise to a claim for negligence. Roger v. Dufrene, 613 So.2d 947, 949 (La.1993). When an insurance advisor voluntarily assumes a task, he must perform that task in a reasonable and prudent manner. La. C.C. art. 3001; see generally, Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).

. At the time the Barrecas surrendered the original 1964 policy for its cash value and then applied the cash surrender value to purchase the policy in 1988, the $20,801 sum was insufficient to equal the total single premium for the policy and riders selected by Mr. Barreca in the application in order for the policy to qualify as "fully paid-up with no more premiums due” at that time.

. The $20,801 essentially prepaid several years of the annual premium. Dividends and surrender of paid up additional insurance for cash value paid for some of the annual premiums. And loans against cash value paid for additional premiums.